## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| In re: | Chapter 7 |
| LITTLE RIVER HEALTHCARE HOLDINGS, LLC, *et al.* | Case No. 18-60526-RBK |
| Debtors. | (Jointly Administered) |
| | Adv. Proc. No. 20-06095-RBK |
| James Studensky, Chapter 7 Trustee for Little River Healthcare Holdings, LLC, *et al.*, | |
| Plaintiffs | |
| v. | |
| Health Care Service Corporation, a Mutual Reserve Legal Company, d/b/a Blue Cross and Blue Shield of Texas | |
| Defendant | |

## MOTION OF BLUE CROSS AND BLUE SHIELD OF TEXAS
## FOR WITHDRAWAL OF THE REFERENCE

Pursuant to 28 U.S.C. §§ 157(d) and (e), Federal Rule of Bankruptcy Procedure 5011 and Local Rule 5011, Health Care Service Corporation, a Mutual Legal Reserve Company, d/b/a in Texas as Blue Cross and Blue Shield of Texas and all entities that are affiliates and identified as defendants in these proceedings (collectively, "BCBSTX") hereby respectfully moves to withdraw the reference of this Adversary Proceeding from the United States Bankruptcy Court for the Western District of Texas (the "Bankruptcy Court") to the United States District Court for the Western District of Texas (the "District Court").

Immediate withdrawal of the reference is warranted under 28 U.S.C. § 157(d). In support of this motion, BCBSTX respectfully represents as follows:

1

## PRELIMINARY STATEMENT

1.     The Trustee's Complaint asserts eight non-core claims against defendant BCBSTX, the majority of which turn entirely on state law issues.  The Trustee also includes an objection to BCBSTX's already-disallowed proof of claim in a vain attempt to establish core jurisdiction for this Court over an otherwise patently noncore proceeding.  But that proof of claim asserted contract-based claims against the Debtors that are not sufficient to give the Bankruptcy Court jurisdiction over this Adversary Proceeding as a "core" proceeding.

2.     Accordingly, the Bankruptcy Court lacks authority to enter final orders on all of the tort-based, state law affirmative causes of action at issue here—state law claims asserted against BCBSTX based on alleged conduct that occurred prepetition.  Given that the Adversary Proceeding is still in its infancy, withdrawal of the reference will be more efficient and will lead to a more uniform adjudication of the Complaint.

3.     Moreover, BCBSTX is a defendant in a separate civil suit currently pending in the Western District of Texas in which certain former officers and managers of Little River (whom the Trustee separately has accused of fraudulently siphoning off the Debtors' assets) assert essentially the same allegations and claims against BCBSTX as the Trustee does in the Complaint. *See Jeffrey Madison, Ryan Downton, Peggy Borgfeld, Kevin Owens et al., v. Health Care Services Corporation, d/b/a Blue Cross and Blue Shield of Texas,* Case No. 20-835 [Dkt. No. 1].[1]  Likewise, the Trustee has also targeted a second set of defendants, United (as defined below), in a separate adversary proceeding in which the Trustee accuses United of much of the same conduct of which

---

[1] The same day the Trustee commenced the Adversary Proceeding, plaintiffs Jeffrey Madison, Ryan Downton, Peggy Borgfeld, Kevin Owens, Jeff and Ashley Madison Trust, and Kevin J. Owens Management Trust (the "District Court Plaintiffs") filed a complaint against BCBSTX in the District Court, Case No. 20-835 (the "District Court Case").  A copy of the complaint filed in the District Court Case is attached hereto as **Exhibit C**.  The allegations underlying the District Court Case duplicate the core allegations of the Adversary Proceeding.

he now accuses BCBSTX.  *See James Studensky, Chapter 7 Trustee for Little River Healthcare Holdings, LLC, et al., v. UnitedHealthcare Insurance Company, United Healthcare of Texas, Inc., UnitedHealthcare Benefits of Texas, Inc., UnitedHealthcare Community Plan of Texas, LLC., et al.,* Adv. No. 20−06093-rbk (the "United Healthcare Adversary").  The United Healthcare defendants have already moved to withdraw the reference to the Western District Court of Texas, and this court has granted a stay pending the resolution their motion.  *See* United Healthcare Adv. [Dkt. No. 29].  Accordingly, considerations of judicial economy demand "adjudicating all of the claims, both core and non-core, in the district court . . . ."  *Mirant Corp. v. the Southern Co.*, 337 B.R. 107, 122-23 (N.D. Tex. 2006).

## BACKGROUND

4.       Plaintiff James Studensky, the appointed Chapter 7 Trustee (the "Trustee" or "Plaintiff") for Bankruptcy Estate of Rockdale Blackhawk, LLC, Case No. 18-60528-rbk, the Bankruptcy Estate of Little River Healthcare Holdings, LLC, Case No. 18-60526-rbk, including all bankruptcy estates jointly administered under Case No. 18-60526-rbk, their subsidiaries and affiliates (all collectively referred to herein as "Little River" or "Debtors"), commenced the Adversary Proceeding in the Bankruptcy Court against BCBSTX alleging *inter alia* fraud and constructive fraud, fraudulent inducement, abuse of process, conspiracy and unjust enrichment.  *See* Adversary Complaint [Dkt. No. 1] ("Compl.") at ¶¶ 97-142.[2]

5.       Prior to its bankruptcy, Little River was a rural healthcare provider in Milam County, Texas that decided to enter the market for laboratory services because of its "growth potential."  *Id*. at ¶¶ 17–18.  Little River used third-party reference laboratories and "greatly

_____

[2] A copy of the Adversary Complaint is attached hereto as **Exhibit B.**

expanded" its own laboratory testing. *Id*. at ¶¶ 20–21.  BCBSTX investigated Little River as a result of Little River's laboratory billing expansion. *Id*. at ¶ 32.

6.      On or around March 5, 2018, Little River initiated an arbitration proceeding by filing a demand against BCBSTX, captioned *Rockdale Blackhawk, LLC d/b/a Little River Healthcare v. Blue Cross and Blue Shield of Texas, American Arbitration Association* ("AAA") Case No. 01-18-0001-0136 ("the Arbitration").

7.      Several months later, on July 24, 2018, Little River sought bankruptcy protection by filing its voluntary petition for relief under chapter 11. [Dkt. No. 1].

8.      On November 1, 2018, BCBSTX filed a proof of claim, Claim No. 43-1 (the "POC") as an unliquidated amount estimated to be no less than $26,063,725.44, plus Arbitration costs, attorneys' fees, and pre- and post-judgment interest.  The POC is based on BCBSTX's commercial tort claims and counterclaims asserted against Little River in the Arbitration (as defined below) and asserts rights of setoff and recoupment pursuant to 11 U.S.C. §§ 506(a)(1) and 553.

9.      On December 7, 2018, Little River's bankruptcy was converted to a chapter 7 proceeding when Little River's *Motion to Convert Debtors' Chapter 11 Cases to Chapter 7 Cases Pursuant to 11 U.S.C. § 1112* [Dkt. No. 547] was granted, and James Studensky was appointed the chapter 7 Trustee.

10.      The Arbitration continued through the conversion to a chapter 7 proceeding and Studensky, as Trustee, oversaw Little River's case against BCBSTX and its defense of BCBSTX's counterclaims.

11.      The parties litigated over the propriety of Little River's laboratory billing, among other things, in a two week arbitration hearing in August 2019 (the "Arbitration"), presided over

by a single arbitrator (the "Tribunal").  Compl. at ¶ 22.  Despite its rejection of numerous claims raised by Little River in the Arbitration seeking hundreds of millions of dollars in damages—claims which the Trustee now seeks to relitigate here—the Tribunal issued a final award (the "Final Award"), denying relief on BCBSTX's counterclaims and requiring BCBSTX to pay $97.5 million to Little River in connection with Little River's contract claims, and related statutory penalties, interest and attorneys' fees.

12.     On September 15, 2020, the Trustee filed an Adversary Complaint against BCBSTX [Dkt. No. 1] and served the Summons and Adversary Complaint on BCBSTX the same day. [Dkt. No. 4].  BCBSTX's current deadline to file a response to the Adversary Complaint is November 16, 2020.[3]

13.     Through the Complaint, the Trustee asserts eight claims against BCBSTX, all of which turn entirely on issues of state law.  Specifically, the Complaint includes actions for (i) business disparagement, (ii) civil conspiracy to commit business disparagement, tortious interference with existing contracts, unfair competition, and tortious interference with prospective contracts, (iii) abuse of process, (iv) tortious interference with existing contracts, (v) tortious interference of prospective contracts, (vi) common law claim for unfair competition, (vii) exemplary damages, and (viii) a declaratory judgment.  Compl. ¶¶ 57-155.  In addition, the Trustee objects to the allowance of the already-disallowed POC.  Compl. ¶ 54.

14.     Withdrawal of the reference immediately is warranted because the Trustee demanded a trial by jury, and BCBSTX does not consent to this Court presiding over such jury trial.  The District Court will have to conduct the trial under 28 U.S.C. § 157(e) for those claims

---

[3] The original answer deadline was October 15, 2020, but the Court granted BCBSTX a thirty (30) day extension to answer.  *See Order Granting Motion, on Consent, for Enlargement of Time to Respond to Adversary Complaint* [Dkt. No. 5].

entitled to be tried by jury. Moreover, all of the claims asserted in the Complaint are statutorily and constitutionally non-core matters as to which the Bankruptcy Court may only make a report and recommendation to this Court for *de novo* review. This Adversary Proceeding is at its earliest stage and the Bankruptcy Court is no more familiar with the allegations raised in the Complaint than is the District Court. Accordingly, judicial economy and efficiency is best served by withdrawing the reference immediately to the District Court to handle all pre-trial matters and ultimately adjudicate the issues raised in this proceeding.

## RELIEF REQUESTED

15.     Local Bankruptcy Rule 5011-1 provides that a "motion to withdraw the reference . . . shall be filed under the style and number of the bankruptcy case or adversary proceeding in which reference is sought to be withdrawn and shall be filed with the Clerk of the Bankruptcy Court." Section 157(d) of Title 28 provides that "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party for cause shown."

16.     Accordingly, BCBSTX respectfully requests that the District Court withdraw the reference of this Adversary Proceeding for cause. Consistent with Supreme Court, Fifth Circuit, and District Court precedent, cause exists to withdraw the reference because nearly all of the claims asserted by the Trustee are non-core state law claims and BCBSTX has not consented to the Bankruptcy Court's entry of final orders. Since the Bankruptcy Court cannot enter final orders in non-core matters or conduct jury trials absent consent of all parties, cause exists to grant the relief requested in furtherance of judicial economy. As such, BCBSTX requests the entry of an order substantially the same as the proposed order attached hereto as **Exhibit A**, granting the Motion and assigning the Adversary Proceeding to the District Court.

## ARGUMENTS AND AUTHORITY

**A.     The *Holland America* Factors Support Permissive Withdrawal of the Reference**

17.     In deciding whether cause exists to withdraw the reference, the Fifth Circuit has traditionally considered the outer limits of the jurisdiction referred to the bankruptcy courts in conjunction with a number of factors bearing on judicial economy, including:

(a)     promoting uniformity in bankruptcy administration;

(b)     reducing forum shopping and confusion;

(c)     fostering the economical use of debtors' and creditors' resources;

(d)     expediting the bankruptcy process; and

(e)     the right to a jury trial.

*Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-999 (5th Cir. 1985).

18.     Consistent with the *Holland* decision and recent case law, a District Court's initial determination prior to considering these factors will turn on whether the asserted causes of action are core bankruptcy proceedings or non-core proceedings, since a bankruptcy court's limited ability to "hear and determine" non-core proceedings directly impacts the subsequent questions of efficiency and uniformity.  *See Mobley v. Quality Lease & Rental Holdings, LLC* (*In re Quality Lease & Rental Holdings, LLC*), Case No. 14-60074, at *7 (Bankr. S.D. Tex. Feb. 1, 2016); *In re Chau*, Civil Action No. 16-14733 Section: "E" (E.D. La. Oct. 31, 2016) ("initial determination should be whether the claim is a core bankruptcy proceeding or whether it is non-core . . . [because] it is upon the issue of coreness that questions of efficiency and uniformity will turn") (internal citations and quotations omitted).

**B.     The Causes of Action in the Adversary Proceeding are Non-Core**

19.     First and foremost, withdrawal of the reference here is appropriate given the absence of any *live* core proceeding under 28 U.S.C. § 157(b).  Although the Trustee attempts to

position this Adversary Proceeding as a core proceeding by objecting to the POC, the Trustee overlooks the fact that the claims asserted by BCBSTX in the POC have already been adjudicated and disallowed by the Tribunal in the recent Arbitration, and subsequently reduced to a final judgment by the Bankruptcy Court.   *See Agreed Order Confirming Arbitration Awrad sand Final Judgment* [Docket No. 9], *Rockdale Blackhawk, LLC v. Blue Cross and Blue Shield of Texas*, Adv. No. 06-06006 (Bankr. W.D. Tex. Jun. 8, 2020).  As a result, the only *core* proceeding alleged here—that concerning the allowance or disallowance of claims against the estate under 28 U.S.C. § 157(b)(2)(A)—has nothing left for the Bankruptcy Court to decide.  What remains are patently non-core proceedings, including tort-based claims for business disparagement, tortious interference with contracts, unfair competition, and the like.

20.     Only claims arising under title 11 or arising in a case under title 11 are "core" proceedings, and absent consent of the parties a bankruptcy court may only hear *and determine* by entry of final orders or judgments matters that are core proceedings.  28 U.S.C. § 157(b)(1).  A claim "arises under" title 11 if it is created or determined by a particular statutory provision of the Bankruptcy Code, such as suit to avoid a preferential or fraudulent transfer under 11 U.S.C. § 547 or § 548.  *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987).  A dispute "arises in" a case under title 11 if it is of the sort that would arise only in a bankruptcy case (for example, a matter concerning the sale of property of the state).  "In other words, "arising in" proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy."  *Id.* at 97.

21.     Conversely, if the matter is only "related to" a bankruptcy case, the bankruptcy court may only *hear* the matter and issue proposed findings and conclusions to the district court for de novo review unless the parties to the dispute consent to the entry of final orders and

judgments by the bankruptcy court. 28 U.S.C. § 157(c). A claim is merely "related to" a case under title 11 if "the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy." *Wood v. Wood* 825 F.2d at 93. More specifically, "the anticipated outcome of the action must both (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate." *Mahoney v. Washington Mutual, Inc. (In re Mahoney)*, 368 B.R. 579, 583 (Bankr. W.D. Tex. 2007) (quoting *In re Bass,* 171 F.3d 1016, 1022 (5th Cir. 1999)).

22.     Here, it is indisputable that, aside from his objection to the already-disallowed POC, the remaining   the affirmative claims of the Complaint assert only causes of action that neither arise in the Debtors' bankruptcy cases nor arise under title 11 and are therefore non-core proceedings. Insofar as the claims are property of the bankruptcy estates such that their outcome could conceivably impact the administrative of the estate (by augmenting the funds available for distribution to creditors if successful), they are merely non-core proceedings that the Bankruptcy Court may hear, but cannot finally adjudicate absent the consent of all parties involved. *See also In re Mahoney*, 368 B.R. 579, 583 (Bankr. W.D. Tex. 2007) (explaining that tort action is a non-core proceeding); *Hatzel Buehler v. Orange Rockland Utils., Inc.*, 107 B.R. 34 (D. Del. 1989) (holding that the adversary proceedings constituted a "non-core proceeding" because they did not "involve any interpretation of the Bankruptcy Code and [were] not otherwise related to the underlying bankruptcy proceeding pending before the Bankruptcy Court . . . [the] torts claims do not involve a 'core proceeding' because of the contingent nature of the litigation concerning the adversary proceedings").

23.     The lingering existence of the POC on the register does not change the foregoing analysis because the claims asserted in the POC were already adjudicated in the course of the

Arbitration resulting in a final judgment, and there is nothing left for the Bankruptcy Court or the District Court to do in respect of the "allowance or disallowance of claims" that could conceivably trigger a core proceeding under 28 U.S.C. § 157(b)(2)(B). Indeed, the Trustee pleads in the Adversary Complaint that the POC was already decided. *See* [CITE] ("Claim No. 422 seeks payment of amounts that are not enforceable against the Debtors under applicable law and are based on the factual dispute already decided in the Arbitration Proceeding.) Moreover, the Trustee's claims asserted in the Complaint are so-called *Stern* claims that, notwithstanding the provisions of 28 U.S.C. § 157(b)(2)(C), the Bankruptcy Court has only statutory—but not constitutional—authority to determine. *See Stern v. Marshall*, 564 U.S. 462, 503 (2011) (concluding that notwithstanding its statutory authority under 28 U.S.C. § 157(b)(2)(C), a bankruptcy court lacks *constitutional* authority to enter a final judgment on a state law counterclaim that is not necessarily resolved in the process of ruling on the creditor's proof of claim). Either way, the lingering existence of the POC in the court's claims register does not elevate this Adversary Proceeding to the status of a core proceeding.

24. Accordingly, this factor weighs heavily in favor of immediately withdrawing the reference of the entire Adversary Proceeding.

**C. Judicial Economy Favors Withdrawal**

25. Because what remains here are only noncore proceedings, the second *Holland America* principle – the goal of judicial economy – is best served by withdrawal of the reference. "If a bankruptcy court is already familiar with the facts of the underlying action, then allowing that court to adjudicate the proceeding will promote uniformity in the bankruptcy administration." *Johnson v. Williamson* (*In re British Am. Props. III, Ltd.*), 369 B.R. 322, 327 (Bankr. S.D. Tex. 2007). This Adversary Proceeding is currently in its earliest stage in the Bankruptcy Court as BCBSTX has not yet answered or otherwise responded to the complaint the Bankruptcy Court has

not decided any motion, and no discovery has taken place.  Consequently, none of the procedural or substantive issues in the Adversary Proceeding have yet been presented to the Bankruptcy Court for analysis or determination.  The Bankruptcy Judge has not yet invested significant time or effort into the Trustee's allegations, and is not yet so familiar with the case that withdrawing the suit would disrupt the uniformity of bankruptcy administration.  *See, e.g., Waldron v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA (In re EbaseOne Corp.)*, 2006 Bankr. LEXIS 1861 at * 13-15 (Bankr. S.D. Tex. June 14, 2006).  The Bankruptcy Judge is not any more familiar with the facts and issues underlying this Adversary Proceeding as the District Court is, and withdrawing the reference immediately will foster judicial economy by preventing duplicate review of the facts and issues asserted in this Adversary Proceeding.

26.

27.     As noted above, the application of non-bankruptcy law makes clear that this is a non-core proceeding.  Accordingly, the Bankruptcy Court cannot issue final orders and only the District Court may properly hear and resolve the Adversary Proceeding on a final basis.  Withdrawal of the reference will promote uniformity and efficiency in the Adversary Proceeding by centralizing the case in one forum and avoiding duplication of effort thereby preserving judicial resources.  Accordingly, this factor weighs strongly in favor of withdrawal.

### D.    There Is No Indicia of Forum Shopping

28.     "A good faith claim of right, even when motivated (at least in part) by a desire for a more favorable decision maker, should not on that basis alone be denied as forum shopping." *Veldekens v. GEHFS Holdings, Inc.*, 362 B.R. 762, 769 (S.D. Tex. 2007) (declining to find improper forum-shopping by party requesting withdrawal even though that party had previously agreed to adjudication by the bankruptcy court, as circumstances had changed since prior consent had been given).  Here, there are no indicia of forum shopping by Defendant.  If the Bankruptcy

Court were to adjudicate this lawsuit, it would be limited to submitting recommended findings of fact and conclusions of law to the District Court, which would then enter its final judgment after a *de novo* review.  Under these circumstances, it is evident that BCBSTX seeks merely to have a primarily non-core proceeding litigated without additional expense.  In the absence of any evidence that the request for withdrawal of the reference is motivated by considerations of forum-shopping, this factor favors withdrawal of the reference.

### E.    Withdrawing the Reference Is the Most Efficient Use of the Debtor's and Creditors' Resources

29.    This factor also weighs in favor of withdrawing the reference.  This is not a case where the Bankruptcy Court and the parties have proceeded through discovery for months before an attempt to withdraw the reference was made.  Moreover, the District Court will necessarily address similar issues in connection with the also-pending District Court Case, and pursuing those related cases in a single forum would be most efficient for the parties.  Withdrawal of the reference will not cause either party to "lose" any amount of resources spent thus far because, beyond the initial pleadings, the parties have not invested significant resources in this proceeding before the Bankruptcy Court.

### F.    Withdrawal of the Reference will expedite administration of the Debtors' cases.

30.    "A district court should consider the importance of the proceeding to the bankruptcy case and refuse to withdraw the reference if the withdrawal would unduly delay the administration of the bankruptcy case." *Guffy v. Brown* (*In re Brown Med. Ctr., Inc.*), 578 B.R. 590 (Bankr. S.D. Tex. 2016).  On balance, conducting these proceedings  in the District Court will be more expeditious for two reasons.  First, because the Bankruptcy Court can only issue proposed findings of fact and conclusions of law for *de novo* review by the District Court, withdrawal of the reference will eliminate that intervening step and thereby promote the more expeditious resolution

of this Adversary Proceeding and, by extension, the bankruptcy cases.  Further, if the District Court withdraws the reference now, it will allow the District Court to gain valuable exposure early on to the issues raised in this Adversary Proceeding that will ultimately facilitate the District Court's ability to swiftly and efficiently decide those issues once presented for adjudication.  On balance, therefore, this factor counsels in favor of immediate withdrawal of the reference.

### G.    The Trustee's Demand for a Jury Trial

31.    A critical factor considered by courts in analyzing whether withdrawal is appropriate is whether the parties have requested a jury trial.  *In re Brown Med. Ctr.*, 578 B.R 590; *In re British Am. Props.*, 369 B.R. 322; *In re NDEP Corp.* 203 B.R. 905 (Bankr. D. Del. 1996). This factor is important because, absent the express consent of both parties, a bankruptcy court may not hold a jury trial in a non-core proceeding.  28 U.S.C. § 157(e). *See also Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008); *Mirant Corp.*, 337 B.R. at 122; *In re S. Win, Inc.*, No. 08-41279-BTR, 2008 WL 5642490, at *1 (Bankr. E.D. Tex. Dec. 19, 2008); *In re Nu Van Tech., Inc.*, No. 01-49589-DML-11, 2003 WL 23785355, at *4 (Bankr. N.D. Tex. Oct. 14, 2003); *see also In re Clay*, 35 F.3d 190, 195 (5th Cir. 1994) ("where a case or controversy gives rise to a Seventh Amendment right to a jury trial, Congress may not give jurisdiction to a non-Article III court.").  BCBSTX does *not* consent to have the Bankruptcy Court conduct a trial by jury of this Adversary Proceeding; therefore, the Trustee may only exercise its right to jury trial if the reference is withdrawn.

32.    The Seventh Amendment to the United States Constitution provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . ." *In Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).  In *Granfinanciera*, the Supreme Court explained that the right to a jury trial depends on whether the

remedy in the cause of action is legal or equitable, stating that a three-part test is employed to determine such right:

> First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity.  Second, we examine the remedy sought and determine whether it is legal or equitable in nature.  The second stage of the analysis is more important than the first.  If, of the balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as a fact finder.

*Granfinanciera*, 492 U.S. at 42.

33.     Here, the Trustee has requested a trial by jury in the Bankruptcy Court.  Compl. ¶ 107.  The Trustee seeks money damages (*Id.* ¶¶ 57-97), as well as equitable relief, such as the Trustee's request for a declaratory judgment.  *Id.* at ¶¶ 53-56, 98-105.   The tort actions for monetary damages, which are legal in nature and provide the Trustee with a right to a jury trial of the claims seeking a monetary judgment.  *Granfinanciera*, 492 U.S. at 47–48 ("an action for fraud seeking the payment of money damages is an action sounding in tort which would have been heard by an English court of law"); *In re British Am. Props.*, 369 B.R. at 329 (an action to recover monetary transfers is legal in nature and defendants are entitled to a jury trial).

34.     Conversely, the Trustee is not entitled to a jury trial for those claims seeking equitable relief, including the objection to BCBSTX's POC.  *See Katchen v. Landy*, 382 U.S. 323, 86 S. Ct. 467, 15 L. Ed. 2d 391 (1966); *see also Curtis v. Loether*, 415 U.S. 189, 196 n. 11, 94 S. Ct. 1005, 1009 n. 11, 39 L. Ed. 2d 260 (1974) (where legal and equitable claims are intertwined, the right to a jury remains as to the legal claims and "all issues common to both claims.").

35.     Thus, to the extent the Trustee is entitled to have its claims adjudicated by a jury, the reference must be withdrawn for those such claims absent consent of BCBSTX[4] for a jury trial in the Bankruptcy Court.[5]

36.     Judicial efficiency therefore mandates immediate withdrawal to the District Court of the entire proceeding to avoid significant duplication of effort and inconsistent outcomes.  *See Mirant Corp.* 337 B.R. at 122-23 (holding that, where both the core and non-core claims were significant, judicial economy would be served by adjudicating all the claims in the district court because, in part, "adjudicating all of the claims, both core and non-core, in the district court eliminates the prospect of an appeal from the bankruptcy judge's adjudications of core claims. . . .").

37.     Finally, the claims the Trustee asserts against the BCBSTX do not "stem from the bankruptcy itself," nor do they "necessarily resolve a creditor's proof of claim."  *Stern*, 564 U.S. 462.  Rather, such matters are reserved solely for Article III judges and, as such, may not be adjudicated in the Bankruptcy Court.  The presence of a right to a trial by jury overwhelmingly weighs in favor of withdrawing the reference.

38.     Based on the forgoing, cause exists for the District Court to withdraw the reference of the Adversary Proceeding under 28 U.S.C. § 157(d).

*[Remainder of Page Intentionally Left Blank]*

---

[4] BCBSTX will provide a formal response to the jury trial demand in its "Response Regarding Consent" pursuant to L.B.R. 9015(b), and reserves all rights in connection therewith.  For purposes of this Motion, BCBSTX does not consent to a jury trial before the Bankruptcy Court as stated herein and the Trustee's claims are not core.

[5] *See* 11 U.S.C. § 157(e).

November 16, 2020                    Respectfully submitted,


                                     By:  */s/ Michael Fishel*
                                     Yvette Ostolaza
                                     State Bar. No. 00784703
                                     SIDLEY AUSTIN LLP
                                     2021 McKinney Avenue, Suite 2000
                                     Dallas, Texas 74201
                                     Telephone: (214) 981-3300
                                     Facsimile: (214) 981-3400
                                     yvette.ostolaza@sidley.com

                                     – and –

                                     Brian P. Kavanaugh (*admission pending*)
                                     SIDLEY AUSTIN LLP
                                     One South Dearborn St.,
                                     Chicago, Illinois 60603
                                     Telephone: (312) 853-7617
                                     Fascimile: (312) 853-7036
                                     bkavanaugh@sidley.com

                                     – and –

                                     Michael Fishel
                                     State Bar No. 24082998
                                     SIDLEY AUSTIN LLP
                                     1000 Louisiana St., Suite 5900
                                     Houston, Texas 77002
                                     Telephone: (713) 495-4500
                                     Facsimile: (713) 495-7799
                                     mfishel@sidley.com

                                     *Counsel for Health Care Service Corporation, a*
                                     *Mutual Legal Reserve Company, d/b/a Blue Cross*
                                     *and Blue Shield of Texas*

By: *  /s/ Michael P. Cooley*
Martin J. Bishop
(SBN 24086915)
Michael P. Cooley
(SBN 24034388)
REED SMITH LLP
2501 N. Harwood, Suite 1700
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
mbishop@reedsmith.com
mpcooley@reedsmith.com

William J. Sheridan (*pro hac vice motion forthcoming*)
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
T: 412.288.3131
F: 412.288.3063
wsheridan@reedsmith.com

*Counsel to Blue Cross and Blue Shield of Texas, an unincorporated division of Health Care Service Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2020, the foregoing Motion to Withdraw the

Reference was sent to counsel for the plaintiffs by email or via electronic notice through the

Court's CM/ECF System, as set forth below:

Brad Thompson
BThompson@duanemorris.com
Jacob P. Arechiga
JArechiga@duanemorris.com
James Earl
JVEarl@duanemorris.com
**DUANE MORRIS LLP**
Las Cimas IV
900 S. Capital of Texas Hwy, Suite 300
Austin, TX 78746-5435

Brian T. Cumings
GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, TX 78701
bcumings@gdhm.com

By: */s/ Michael Fishel*
Michael Fishel

## **EXHIBIT A**

PROPOSED ORDER

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| LITTLE RIVER HEALTHCARE HOLDINGS, LLC, *et al.* | Case No. 18-60526-RBK |
| Debtors. | (Jointly Administered) |
| | Adv. Proc. No. 20-06095-RBK |
| James Studensky, Chapter 7 Trustee for Little River Healthcare Holdings, LLC, *et al.*, | |
| Plaintiffs | |
| v. | |
| Health Care Service Corporation, a Mutual Reserve Legal Company, d/b/a Blue Cross and Blue Shield of Texas | |
| Defendant | |

**ORDER GRANTING THE MOTION OF**
**BLUE CROSS AND BLUE SHIELD OF TEXAS TO WITHDRAW THE REFERENCE**

The Court, having considered the *Motion of Blue Cross and Blue Shield of Texas to Withdraw the Reference* (the "Motion") requesting that this Court immediately withdraw the reference to the District Court, and the Court, having reviewed the Motion, and finding that there is good cause to grant the Motion,

IT IS HEREBY:

ORDERED that the Motion is GRANTED, and is further

ORDERED that the *Order of Reference of Bankruptcy Cases and Proceedings* is hereby withdrawn as to the Adversary Proceeding No. 20-06095 currently pending in the United States Bankruptcy Court for the Western District of Texas; and it is further

ORDERED that the Adversary Proceeding No. 20-06095 shall be assigned to the United States District Court for the Western District of Texas, Waco Division for further proceedings and trial.

# # #

## **EXHIBIT B**

ADVERSARY COMPLAINT

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| LITTLE RIVER HEALTHCARE | § | Case No. 18-60526-rbk |
| HOLDINGS, LLC, *et al.* | § | (Jointly Administered) |
| Debtors[1] | § | |
| | § | |
| _____ | § | Adv. Proc. No. |
| | § | |
| James Studensky, Chapter 7 Trustee for Little | § | _____ |
| River Healthcare Holdings, LLC, et al. | § | |
| | § | |
| Plaintiff | § | |
| v. | § | |
| | § | |
| Blue Cross and Blue Shield of Texas | § | |
| | | |
| Defendant | | |

## ADVERSARY COMPLAINT

James Studensky, the duly appointed Chapter 7 Trustee (the "Trustee") for Little River Healthcare Holdings, LLC, et al. (the "Debtors" or "Little River"),[2] by and through his undersigned counsel, files this adversary complaint (the "Complaint") against defendant Blue Cross and Blue Shield of Texas ("BCBSTX" or "Defendant"), seeking monetary damages for business disparagement (Count I), civil conspiracy (Count II), abuse of process (Count III), tortious interference with existing contracts (Count IV), tortious interference of prospective contracts (Count V), claim for unfair competition (Count VI), and to disallow any claims held by Defendant.

---

1 The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Compass Pointe Holdings, LLC (1142), Little River Healthcare Holdings, LLC (7956), Timberlands Healthcare, LLC (1890), King's Daughters Pharmacy, LLC (7097), Rockdale Blackhawk, LLC (0791), Little River Healthcare - Physicians of King's Daughters, LLC (5264), Cantera Way Ventures, LLC (7815), and Little River Healthcare Management, LLC (6688).

2 Where appropriate, references in this Adversary Complaint to "Little River" include the Trustee.

In support of this Complaint, the Trustee, on behalf of all of Little River bankruptcy estates jointly administered under Case No. 18-60526-rbk, their subsidiaries and affiliates (all collectively referred to herein as "Little River"), seeks monetary damages and avers as follows in support:

## I.    NATURE OF CASE

1.    This action arises out of the Defendant's improper smear campaign which harmed Little River's economic interests and irreparably damage its business.  Little River was a rural healthcare provider located in Rockdale, Texas that – like all rural healthcare providers – depended on timely payments from insurance companies for its survival.

2.    BCBSTX and Little River have previously engaged in a dispute regarding BCBSTX's lack of timely payment for Little River's provision of laboratory services provided to BCBSTX members under the contracts between BCBSTX and Little River.  This contract dispute, including BCBSTX's allegations of fraud, has since been resolved via arbitration and confirmed via a final, non-appealed judgment.

3.    In the arbitration, Little River was victorious on its contract and prompt pay claims, with BCBSTX losing on all of its counterclaims, including its allegations that Little River had engaged in fraud.

4.    Little River's contract issues, resolved via the Parties' arbitration, are not the subject of this Complaint.  This action concerns the tortious conduct of BCBSTX falling outside of the Parties' contractual relationship.

5.     Unknown to Little River at the time, BCBSTX unleashed a widespread, bad faith smear campaign against Little River that severely harmed Little River's economic interests, irreparably damaged the business of Little River, and caused its ultimate demise.  It is this smear campaign that is the subject of this Complaint.

6.  BCBSTX submitted a series of false accusations of fraudulent billing against Little River to government regulators in hopes of leveraging governmental regulators to commence a formal investigation against Little River.

7.  Although ostensibly BCBSTX may have been justified in making an initial report of suspected fraud to governmental regulators, immediately upon commencement of its sham "investigation" of Little River, BCBSTX knew, and in the exercise of reasonable diligence certainly should have known, that Little River did not commit fraud.  Despite this knowledge, BCBSTX persisted in its bad faith campaign to continue maliciously asserting false accusations about Little River to regulators as part of an internal BCBSTX policy to use government regulators as a point of leverage against vulnerable rural healthcare hospitals, like Little River.  Moreover, after initiating its sham investigation into Little River, BCBSTX failed to update governmental regulators with material exculpatory information that would have further revealed that BCBSTX's initial accusations of fraud were inaccurate.

8.  Defendant's knowing publication of these false allegations of fraud about Little River to regulators pursuant to its improper scheme amounts to business disparagement and abuse of process.

9.  Defendant's scheme was not limited to incomplete and false reports to regulators; BCBSTX sought to vilify Little River throughout the larger healthcare community.  At a major industry conference, under the auspice of purported "fraud prevention" BCBSTX representatives brazenly announced verbally and in writing to major players in the healthcare community—including the nation's largest insurance payors, regulators, and healthcare associations—that Little River was engaged in "fraudulent" billing even though BCBSTX knew, or in the exercise of reasonable diligence should have known, such claims were false.

10. Going further, BCBSTX also provided instructions to other national insurance payors on ways to cease payment and amend or terminate contracts with rural hospitals, including Little River. Indeed, one of the recipients of such false statements and payment instructions included UnitedHealthcare, one of the nation's largest healthcare insurance companies. Unsurprisingly, once BCBSTX further maligned Little River directly to UnitedHealthcare, that insurance company also changed its payment behavior toward Little River and renegotiated its contract (as suggested by BCBSTX) to a less favorable payment rate. BCBSTX's publication of these false claims of fraud to the healthcare community amounts to business disparagement.

11. Defendant's conduct severely damaged Little River's economic interests and harmed its business by crippling Little River's relationships with other healthcare insurance companies and its ability to receive timely reimbursement. BCBSTX's tortious actions resulted in Little River's bankruptcy. The Trustee seeks recovery of the amounts of all damages to Little River due to Defendant's actions.

12. In addition, the Trustee seeks to disallow, pursuant to § 502(d) and (j) of the Bankruptcy Code, any claim that any of the Defendant has filed or asserted against the Debtors or that has been scheduled for the Defendant. The Trustee does not waive but hereby reserves all of his rights to object to any such claim for any reason, including, but not limited to, any reason set forth in § 502(a) through (j) of the Bankruptcy Code.

## II. THE PARTIES

13. James Studensky is the duly appointed and serving Chapter 7 trustee for the bankruptcy estate Rockdale Blackhawk, LLC d/b/a/ as Little River Healthcare, which was a Texas limited liability company, which had its principal place of business at 1700 Brazos Ave., Rockdale, Texas 76567, and for various affiliated entities jointly administered under the above styled and named main case. On July 24, 2018, Little River filed for Chapter 11 bankruptcy protection in the

United States Bankruptcy Court for the Western District of Texas.[3] The jointly administered Chapter 11 proceeding was converted to a Chapter 7 proceeding on December 7, 2018, and James Studensky was appointed Chapter 7 Trustee (collectively, the Chapter 11 and Chapter bankruptcies are referred herein as the "Bankruptcy Proceeding.").   Notices related to this proceeding may be provided to Trustee through undersigned counsel.

14.     Upon information and belief, BCBSTX is an unincorporated division of Health Care Service Corporation, a Mutual Legal Reserve Company and an independent Licensee for the Blue Cross Blue Shield Association ("BCBS Association").   BCBSTX maintains its principal place of business at 1001 E. Lookout Drive, Richardson, Texas 75082.

15.     The Trustee (on behalf of the estate of Little River) and BCBSTX are collectively referred to as the Parties.

## III.     <u>JURISDICTION AND VENUE</u>

16.     On November 1, 2018, BCBSTX filed a Proof of Claim in the Bankruptcy Proceeding, seeking approximately $26,063,725.44.   BCBSTX's Proof of Claim constitutes a Core Proceeding under the Bankruptcy Code.   Further, throughout the Bankruptcy Proceeding, BCBSTX has repeatedly invoked this Court's jurisdiction and sought relief from the court in numerous ways.   BCBSTX has availed itself of the jurisdiction of this court, and as such, the Trustee's Complaint is appropriately before this court.

---

3 See *In re: Little River Healthcare Holdings, LL, et. al*., Case No. 18-60526-rbk (Bank. W.D. Tex. 2018). All relevant Debtors are listed in Footnote 1, supra.

## IV.    FACTUAL BACKGROUND

A.    Relationship Between Little River and BCBSTX and Prior Arbitration

17.    Prior to its cessation of operations in bankruptcy, Little River was a rural healthcare provider in Milam County, Texas, operating the only Critical Access Hospital in Milam County, Texas—the Rockdale Hospital.[4]  Little River provided services to patients and then billed each patient's insurance company for the services rendered.

18.    Beginning in 2012, Little River started to acquire outpatient clinics and grow its provider network in order to offset the costs of running a rural hospital.  This also allowed Little River to provide expanded services and its physician network to patients that historically would not have been available in its rural hospital, such as cardiology and orthopedics, with a proprietary business model that brought doctors from neighboring urban areas to treat members of the rural community.  However, even with an increasing physician network and these future expansion plans, Little River remained a struggling rural hospital system in search of new sources of revenue and areas of revenue growth.  Little River identified laboratory services as an area with growth potential.

19.    One way hospitals generally (and Little River specifically) have historically made available laboratory services that they are unable to provide directly within their physical "four walls" is to utilize "reference laboratories" to perform laboratory work.  This practice has been utilized for decades, is still in place today, and is consistent with the Centers for Medicare & Medicaid Services ("CMS") guidelines in place today.

---

4 Little River was a Central Texas-based healthcare medical network provider.  In addition to the Rockdale Critical Access Hospital, Rockdale Blackhawk, LLC owned and operated another rural hospital in Cameron, Texas.  Little River also had an expansive physician network along with other medical clinics and imaging centers.

20.     As a small rural hospital without economies of scale, there are some services that Little River (like all rural hospitals) would be unable to perform without utilization of third-party reference laboratories.  For such services, a hospital utilizes a third-party laboratory to provide the service to hospital patients and then bills the patient (or the patient's insurance company) for all services rendered.  Little River had used third-party reference laboratories as far back as at least 2004.

21.     In addition, starting in 2014, Little River also greatly expanded its on-site laboratory testing capabilities by building an entire laboratory wing onto its Rockdale Hospital, with the ability to perform a wide array of laboratory testing.  This constituted an over 4,000 square foot expansion to the Rockdale Hospital, and over time, it was filled with various advanced laboratory testing equipment.  In early 2016, Little River hired a laboratory company to assist it with further building out and running a laboratory on campus at the Rockdale Hospital, which further expanded Little River's on-site laboratory capabilities.

22.     Despite being allowed to bill for these laboratory services – whether conducted at the expanded on-site laboratory or via reference labs – BCBSTX began to stop paying for many of these services in ways that were often hidden or otherwise obscured this lack of payment.  After months of outreach and other efforts to seek payment pursuant to the contracts between the Parties, ultimately Little River was forced to initiate an arbitration proceeding ("Arbitration Proceeding")[5] against BCBSTX in March 2018 regarding the Parties' contractual dispute over BCBSTX's lack of payment.  The arbitration hearing was conducted for two weeks in August 2019, with a final award issued on May 6, 2020.

---

[5] *In the Matter of the Arbitraiton between Rockdale Blackhawk, LLC d/b/a Little River Healthcare v. Blue Cross and Blue Shield of Texas*, Case No. 01-18-0001-0136, American Arbitration Association.

23.     Little River won its contract claims against BCBSTX, as well as its claims regarding BCBSTX's violation of Texas Prompt Pay statutory laws, with the Tribunal finding conclusively that Little River was entitled to bill and be reimbursed for the laboratory services it provided to patients. The Tribunal found against BCBSTX on all of its counterclaims, including the Tribunal's finding that Little River did not commit any fraud—despite BCBSTX's campaign to convince the healthcare community otherwise.

**B.      Scheme to Damage Little River's Economic Interests and Hurt Little River's Business**

24.     BCBSTX engaged in an elaborate, malicious scheme that destroyed Little River's economic interests. BCBSTX sought to manipulate government regulators in an effort to exert pressure on Little River to accept lower reimbursement rates for laboratory services, and/or change its expanding business plan in such a way as to meet the financial goals of BCBSTX.

25.     Only after the filing of the bankruptcy did Little River discover, first, the existence of the Defendant's illicit scheme, and second, that Little River was specifically one of the unwitting victims of BCBSTX's scheme.

26.     Specifically, Little River discovered that: (i) BCBSTX acted in bad faith and submitted a false report of fraud allegedly committed by Little River to the Office of Personnel Management Office of the Inspector General ("OIG"); and (ii) BCBSTX published, and repeated, verbal and written false statements to the healthcare community at large, including that Little River was engaged in fraudulent billing for its laboratory services.

27.     These false statements were published to all of the other major insurance payors that Little River had existing contractual relationships with (e.g. Aetna, Cigna, Humana, UnitedHealthcare), and BCBSTX went even further by seeking to get other insurance payors, as well as government regulators, to target Little River.  BCBSTX knew, or in the exercise of

reasonable diligence should have known, that its accusations of fraud were false as now has been conclusively proven in the Arbitration Proceeding between the Parties.[6]

28.     Ultimately, BCBSTX's false claims were disseminated to government regulators, other insurance payors, healthcare associations, various others in the healthcare community, and on information and belief, others beyond the healthcare community.  At all relevant times, BCBSTX knew that the claims at issue are false, and/or acted in reckless disregard for their veracity.

29.     Defendant's flagrant spreading of these false claims caused Little River substantial damages, including, but not limited to, interference with and damage to Little River's business relationships and contracts with other insurance payors upon whom Little River depended for survival as a rural community hospital system.

30.     BCBSTX's vilifying statements and bad faith intent are reflected in its own internal documents.  Indeed, internal BCBSTX documents revealed the plot to use illegal means to bully small healthcare providers, like Little River.  These internal documents show the details of BCBSTX's process to reduce financial exposure to rural healthcare providers, including Little River, and to target other rural hospitals.[7]

---

6 *See* Arbitration Proceeding, Final Award, May 6, 2020, ¶¶ 46 and 136:

> BCBSTX alleges that Little River's laboratory billing scheme was fraudulent. Specifically, BCBSTX claims Little River made specific representations and omissions in its claims submissions by coding claims to hide that the testing was not performed by Little River, and by obscuring who was actually performing the services in the medical records it submitted during pre-payment review. According to BCBSTX, Little River's nondisclosure that it was engaging in improper pass-through billing and developing its massive laboratory outreach program constituted a misrepresentation of material fact on which BCBSTX relied by paying tens of millions of dollars in improper laboratory billing.

> …..

> The grounds for BCBSTX's fraud counterclaims are the same as those it asserted in defense of Little River's claims. For the reasons explained above, these counterclaims fail.

7 The documents referenced herein are not attached, as the Parties have engaged in a protracted dispute and disagreement regarding whether, or not, the referenced documents are "Confidential" as asserted by BCBSTX.  Little

31.     BCBSTX further describes rural hospital's reimbursement rates as favorable arrangements that rural hospitals would not want to lose, noting that contractual negotiations with them could be contentious.  BCBSTX further details various mechanisms that BCBSTX could employ use to apply pressure to providers like Little River, including the use of governmental regulators.  In other words, BCBSTX specifically identified its ability to harm providers' economic interests, reputations, and manipulate governmental regulators as unknowing vehicles to injure providers BCBSTX wanted to target.

        i.      *A Sham Investigation and Bad Faith Efforts to Submit False Reports*

32.     Unbeknownst to Little River at the time, on or about April 25, 2016, BCBSTX launched a sham investigation of Little River (the "Investigation") with the purported purpose of investigating complaints from BCBSTX members.  Despite having an internal process, which included at least 18 investigative steps, BCBSTX skipped many of these steps, proceeding to impose an illegal Pre-Payment Review process to immediately suspend payments to Little River. This "investigation" was a sham with a predetermined outcome: BCBSTX simply wanted a pretext to stop paying Little River, and what better way to justify its actions than to falsely accuse Little River of fraud to the government.

33.     In furtherance of its pretextual scheme, on May 31, 2016, BCBSTX sent Little River its "Pre-Payment Review Notice," requesting that Little River contact a BCBSTX Senior Fraud Investigator.  On or about June 8, 2016, Little River contacted the Senior Fraud Investigator, and she informed Little River that the pre-payment review was due to Little River's alleged violation of BCBSTX's *internal policy* related to "Pass Through Billing" of laboratory services.

River disputes that these documents are "Confidential" pursuant to the Protective Order entered into by the Parties (Doc. No. 1027), and reserves its right to contest BCBSTX's confidentiality designations.

BCBSTX's Senior Fraud Investigator did not identify allegations of fraud or any other basis for the pre-payment review. Little River promptly explained to the Senior Fraud Investigator on June 8, 2016 that its actions in billing for laboratory services patients were compliant with Centers for Medicare & Medicaid Services ("CMS") guidelines and also permitted under its agreements with BCBSTX. At this point in time, BCBSTX knew that its dispute with Little River was one regarding, at best, a dispute regarding contractual interpretation—certainly not one related to "fraud."

34. Despite being armed with Little River's explanation, on June 9, 2016 (the day *after* Little River's above-referenced communication), BCBSTX (in partnership with the BCBS Association) submitted a Case Notification regarding Little River (the "Case Notification") to Drew Grimm, a Special Agent with the U.S. Health and Human Services ("HHS") Office of Inspector General ("OIG"), falsely accusing Little River of fraudulent billing.

35. The Case Notification falsely accused Little River of committing fraud. The Case Notification indicated that the allegations were based on "[c]omplaints," and specifically that "complainants received explanation of benefit forms for excessive and expensive lab testing from Rockdale Blackhawk/LRH but had never been to the facility." In the section entitled "Actions," the Case Notification indicated only that "[d]ata analysis was performed . . . provider was placed on review . . . [and] FEP SIU submitted a Case Notification to OPM OIG on June 9, 2016." However, rather than any purported violation of applicable law or regulation, *BCBSTX's OIG Notification was based on a purported violation of an internal BCBSTX policy in its provider manual*.

36. In addition to making a premature and unjustified OIG Notification, BCBSTX, intentionally and in bad-faith chose to completely omit Little River's explanation of why its actions

were fully compliant with contracts, applicable law, and CMS regulations (which, again, Little River had provided to BCBSTX the day before the Case Notification was made). Exacerbating its pretextual report to the OIG, BCBSTX further elected not to update the OIG as it learned more information regarding Little River's on-site expanded laboratory operation capabilities. While BCBSTX did know (or should have known) these issues were never about fraud, BCBSTX intentionally chose to forgo making any updates to the OIG when additional evidence was provided further demonstrating that no fraud was committed by Little River.

37.    Although completely unbeknownst to Little River at the time, it is also now clear that BCBSTX's actions were intentional, and part of BCBSTX's written objective to use government regulators as leverage against vulnerable rural healthcare hospitals, like Little River. BCBSTX was using and manipulating government regulators in bad faith as unknowing vehicles to injure and coerce what BCBSTX would unilaterally predetermine were allegedly noncompliant providers.

      ii.      *Defendant Harms Little River's Economic Interests in the Healthcare Community and Instructs Insurance Payors to Change Payment Practices*

38.    Separate and in addition to its bad-faith efforts to manipulate government regulators, BCBSTX also used its other "levers" to disparage and harm Little River. These "levers" included the further spreading of false allegations that Little River was engaged in fraud throughout the larger healthcare community, and an instruction to insurance payor members of the healthcare community to change their business relationships with Little River, causing direct harm to Little River's economic interests.

39.    BCBSTX representatives brazenly announced verbally and in writing to other major players in the healthcare community—including the nation's largest insurance companies, regulators, and healthcare associations—that Little River was associated with "fraudulent" billing

even though BCBSTX knew, or should have known, that claim was false. At a minimum, BCBSTX could have (but strategically chose not to) provide these third parties with the same explanation that Little River had provided (i.e., that its outreach laboratory program was fully compliant with both its contracts with BCBSTX and applicable law). Again, these allegations of fraud have been conclusively ruled to be untrue in the Arbitration Proceeding.

40. By way of limited example, on or about July 26, 2017, BCBSTX took part in the Healthcare Fraud Prevention Partnership ("HFPP") Regional Information Sharing Session in Irving, Texas (the "Workshop"). The HFPP Information Sharing Session was widely attended, with the program identifying forty-two insurance companies, twenty-seven regulators, and eleven associations, including, but not limited to: Aetna; Amerigroup; Anthem; CareSource; Cigna; Highmark; Humana; Travelers; UnitedHealthcare; Department of Health and Human Services, Centers for Medicare & Medicaid Services; Department of Health and Human Services, Office of Inspector General; Department of Justice, Criminal Division; Department of Justice, Federal Bureau of Investigation; Department of Veterans Affairs; Texas Health and Human Services Commission Office of Inspector General; National Association of Insurance Commissioners; National Association of Medicaid Directors; National Association of Medicaid Fraud Control Units; and National Insurance Crime Bureau.

41. A Senior Manager of the Special Investigations Department of BCBSTX and BCBSTX's Director of the Special Investigations Department made a presentation, with the stated title of the presentation written as: "Focused discussion on recent hospital fraud."

42. The written portion of the presentation delivered by BCBSTX bears the title "Rural & Specialty Hospital Fraud Trends" and purported detailed investigations, "Interventions," "Lessons Learned," and "Carry Forward" that served as a guide for these other entities to go after

Little River through the same inappropriate and unfounded processes as BCBSTX. This included placing such subject hospitals – including Little River explicitly – on prepayment review; amending contracts, re-contracting, or terminating the contracts of those who decline; and referring the case to federal law enforcement, among other advice.

43.    One slide in the presentation contains the heading "Rural & Specialty Hospital Fraud Trends – Results," and directly below that title, BCBSTX prominently names "Little River Healthcare" as first on the list.

44.    Other graphs provided attendees, including other insurance payors with which Little River had existing contracts, with detailed information regarding Little River's financial transactions with BCBSTX.

45.    On information and belief, BCBSTX representatives made verbal misrepresentations during the presentation that were substantively similar to and expanded on the false statements contained in the written presentation, the Pre-Payment Review Notice, and the Case Notification. Specifically, using the graphs, BCBSTX stated or implied that Little River submitted fewer laboratory claims to BCBSTX after it began its investigation because BCBSTX had "caught" Little River doing something inappropriate; when BCBSTX knew that Little River was actually submitting fewer claims because BCBSTX had inappropriately stopped paying Little River for the services, and Little River could no longer continue to provide those services to BCBSTX Members for free.

46.    Five days after the presentation, and outside the confines of the HFPP Workshop, BCBSTX further published the false statements about Little River by sending the written presentation by e-mail to an employee of UnitedHealthcare, and indicated in the transmittal

correspondence that the BCBSTX representative had previously "promised" to share the presentation with UnitedHealthcare.

47.     Unsurprisingly, around the time of BCBSTX's transmission of the false presentation to UnitedHealthcare, Little River found itself in the midst of demands from UnitedHeathcare that its existing contract with United be renegotiated to lower reimbursement rates.

48.     BCBSTX's actions at and after the presentation interfered with, and severely damaged, Little River's relationship with UnitedHealthcare and its ability to achieve favorable contractual terms with UnitedHealthcare.  In addition to UnitedHealthcare, Little River also had existing business and contractual relationships with other payors, and those relationships were also severely damaged as a result of BCBSTX's actions, before, at and after, the HFPP Workshop presentation.

49.     Upon information and belief, BCBSTX's efforts to damage Little River's economic interests by falsely accusing it of fraud were more widespread than the examples set forth herein and both predated and postdated the aforementioned HFPP Workshop.

50.     Upon information and belief, BCBSTX also worked and conspired with other insurance payors to further propagate the publication of false and disparaging fraud allegations regarding Little River, further damaging Little River's economic interests.

51.     Little River had no knowledge of the HFPP presentation and BCBSTX's communications with UnitedHealthcare regarding the presentation until internal BCBSTX documents were produced in the Parties' Arbitration in March of 2019.  Until discovery of these false statements to the broader healthcare community, Little River was unaware of the tortious

actions of BCBSTX that went well beyond its contractual dispute that was recently resolved in Arbitration.

52.     All of BCBSTX's aforementioned actions were done with, malice, fraudulent intent, and at a bare minimum, bad faith, as BCBSTX knew that fraud did not occur, did not provide updated information about Little River with government regulators or other industry payors, and further failed to share exculpatory evidence provided by Little River—all of which had the foreseeable consequence of causing Little River's demise.

## V.     OBJECTION TO BCBSTX'S PROOF OF CLAIM & BCBSTX'S FRAUDULENT CONCEALMENT OF ITS OWN IMPROPER CONDUCT

53.     Trustee incorporates by reference each of the factual allegations contained in the preceding paragraphs.

54.     Pursuant to 11 U.S.C. § 502, Trustee objects to Proof of Claim No. 422, filed by Defendant in the Bankruptcy Proceeding, in its entirety and requests that it be disallowed in its entirety.  Claim No. 422 seeks payment of amounts that are not enforceable against the Debtors under applicable law and are based on the factual dispute already decided in the Arbitration Proceeding.  In the alternative, Trustee requests that Claim No. 422 be equitably subordinated pursuant to 11 U.S.C. §§ 510(c).

55.     Regarding its disparaging comments (verbal and written) and other actions against Little River, Little River was not aware of these actions until after it filed for bankruptcy, and additional discovery is needed to further reveal the extent of BCBSTX's improper actions.

56.     On information and belief, BCBSTX was fraudulently concealing its actions from Little River to ensure that Little River was not aware of BCBSTX's improper actions with government regulators, third-party insurance payors, and others, until ultimately it proved too late and Little River was forced into Bankruptcy.

## VI.    CAUSES OF ACTION

### COUNT I
### Business Disparagement

57.    Trustee incorporates by reference all of the foregoing allegations as if set forth at length herein.

58.    BCBSTX deliberately published false information regarding Little River's billing practices by prematurely submitting an incomplete Case Notification to OIG, and further by making no effort to update or amend its Case Notification with material information. BCBSTX knew the Case Notification contained false information about Little River, or acted with reckless disregard for the veracity of the information, but nevertheless submitted the Case Notification pursuant to BCBSTX's scheme to disparage, injure, and intimidate Little River. BCBSTX also intentionally withheld material information from the Case Notification which was necessary to prevent it from being misleading.

59.    BCBSTX deliberately published verbally and in writing false and disparaging claims that Little River has engaged in fraudulent billing practices, despite having known (or having should have known) that those allegations were not true, to a significant number of participants in the healthcare community, including, but not limited to, Little River's primary insurance payors, regulators, and healthcare associations. BCBSTX further explicitly instructed these members of the healthcare community, in particular other insurance payors, to target Little River through reduced payment, amended or terminated contracts, and referrals to federal law enforcement, among other instructions.

60.    BCBSTX's actions and false statements about Little River severely damaged Little River's economic interests, including, but not limited to, its interests with insurance payors upon whom Little River depended for payment.

61.  BCBSTX's Case Notification is not entitled to qualified immunity because it was submitted with malice, fraudulent intent, or bad faith; namely to give BCBSTX improper leverage over Little River.

62.  BCBSTX acted with malice in publishing the false statements knowing they were false, with reckless disregard for their veracity for the purpose of injuring Little River, with ill will and/or with intent to interfere with Little River's economic interests.

63.  BCBSTX acted in bad faith and lacked privilege to publish the false statements.

64.  BCBSTX's publishing of the false statements caused Little River's business to suffer substantial and special damages, including but not limited to economic injury arising from loss of sales, loss of credit, loss of business; as well as exemplary damages.

**COUNT II**
**Civil Conspiracy to Commit Business Disparagement, Tortious Interference with Existing Contracts, Unfair Competition, and Tortious Interference with Prospective Contracts**

65.  Trustee incorporates by reference all of the foregoing allegations as if set forth at length herein.

66.  Upon information and belief, BCBSTX and the BCBS Association agreed to work cooperatively to promote BCBSTX's policy of using government regulators as leverage against rural vulnerable hospitals, like Little River.

67.  Pursuant to this illicit scheme, BCBSTX initiated the meritless Investigation, failed to exhaust BCBSTX's own eighteen steps for completing investigations, and then provided the incomplete and unsupported Investigation file to the OIG.

68.  At all relevant times, BCBSTX knew, or should have known, its allegations of fraud against Little River were, and are, false.

69.     In addition to the Case Notification, BCBSTX's false publication of fraud allegations against Little River before, at, and after the HFPP Workshop presentations occurred in furtherance of the BCBSTX's conspiracy with the BCBS Association, as well as other insurance payors. BCBSTX was a member of a combination of two or more of these entities that conspired to harm Little River. Little River reserves the right to amend this claim as discovery is ongoing and additional co-conspirators may be uncovered as Little River learns additional facts.

70.     Upon information and belief, the objective of this combination was to accomplish the purpose of target Little River through reduced payments, amended or terminated contracts, and referrals to federal law enforcement, among other instructions; all in the pursuit of profiting BCBSTX and its co-conspirators to Little River's severe detriment.

71.     Upon information and belief, the members of this conspiracy had a meeting of the minds as to this objective, as evidenced by the conduct described in this Complaint that occurred before, at, and after the HFPP Workshop presentations.

72.     Upon information and belief, BCBSTX committed the unlawful, overt acts, as described in this Complaint, in furtherance of this course of action and objective.

73.     The various actions underlying Defendant's illegal actions also constitute business disparagement, tortious interference with existing contracts, unfair competition under common law, and tortious interference with prospective contracts under the applicable laws.

74.     As a direct result of Defendant's conspiracy to disparage Little River, Little River suffered and continues to suffer substantial damages.

## COUNT III
## Abuse of Process

75.     Trustee incorporates by reference all of the foregoing allegations as if set forth at length herein.

76.     BCBSTX, in conjunction with the BCBS Association, made improper use of the OIG reporting process by submitting to OIG the Case Notification that, upon information and belief, BCBSTX knew, or with any effort to ascertain its veracity should have known, contained false information about Little River and omitted information from Little River necessary to prevent the notification from being misleading.

77.     BCBSTX's purpose of improperly submitting the Case Notification was to disparage, injure, and intimidate Little River pursuant to BCBSTX's scheme to apply pressure against Little River.

78.     The submission of the Case Notification was intended to cause governmental regulators to initiate an investigation regarding Little River.

79.     As a direct result of this abuse of the OIG reporting process, Little River suffered and continues to suffer substantial damages.

## COUNT IV
## Tortious Interference with Existing Contracts

80.     Trustee incorporates by reference all of the foregoing allegations as if set forth at length herein.

81.     BCBSTX verbally and in writing, including in its presentations and direct communications, publically made false and disparaging claims that Little River engaged in fraudulent billing practices to a significant number of members of the healthcare community, including, but not limited to, other significant insurance payors and others in the healthcare industry with whom Little River had existing beneficial contractual relationships.

82.     BCBSTX made it known to others in the healthcare industry, including other insurance payors, that it was negotiating for lower payment rates for laboratory services with rural hospitals, including Little River.

83.    BCBSTX's verbal and written false and disparaging statements, statements regarding revisions to payment rates, and explicit guidance that insurance payors should place Little River on prepayment review, and, re-contract, or terminate its contracts, and refer the case to federal law enforcement, triggered healthcare payors and others in the healthcare industry with whom Little River had relationships to change their payment methods under their existing contracts, including restricting payment for covered laboratory services, as well as seeking contract amendments to reduce payment rates for such services.

84.    BCBSTX's actions foreseeably resulted in a loss of benefits of these contracts and lost profits.

## COUNT V
### Tortious Interference of Prospective Contracts

85.    Trustee incorporates by reference all of the foregoing allegations as if set forth at length herein.

86.    BCBSTX verbally and in writing, including in its presentations and direct communications, publically made false and disparaging claims that Little River engaged in fraudulent billing practices to a significant number of members of the healthcare community, including, but not limited to, significant insurance payors and others in the healthcare industry with whom Little River was engaged in negotiation for expansion of its operations and facilities.

87.    On information and belief, BCBSTX's verbal and written false and disparaging claims triggered others in the healthcare industry to abandon plans to partner with Little River in its ongoing expansion efforts.  These expansion plans included, but were not limited to, Little River's plans to build a Georgetown Surgery Center and Little River's contractual relationships with its growing network of physicians and other related business dealings.

88.    BCBSTX's actions resulted in a loss of benefits of these contracts and lost profits.

## COUNT VI
## Common Law Claim for Unfair Competition

89.    Trustee incorporates by reference all of the foregoing allegations as if set forth at length herein.

90.    BCBSTX verbally and in writing publically made false and disparaging claims that Little River engaged in fraudulent billing practices to a significant number of members of the healthcare community, including, but not limited to, significant insurance payors and others in the healthcare industry with whom Little River had existing beneficial contractual relationships. BCBSTX further explicitly instructed these members of the healthcare community, in particular other insurance payors, to target Little River through reduced payment, amended or terminated contracts, and referrals to federal law enforcement, among other instructions.

91.    BCBSTX made it known to others in the healthcare industry, including other payors, that it was negotiating lower payment rates for laboratory services with Little River.

92.    BCBSTX triggered healthcare payors and others in the healthcare industry with whom Little River had relationships to change their payment methods under their existing contracts, including restricting payment for covered laboratory services, as well as seeking contract amendments to reduce payment rates for such services. BCBSTX accomplished this through its false and disparaging statements and its explicit guidance that insurance payors should: put Little River on prepayment review; amend, re-contract, or terminate the contracts of those rural healthcare providers who decline to amend their contracts; and refer allegations of fraud to federal law enforcement.

93.    These tortious acts of BCBSTX foreseeably interfered with Little River's ability to conduct its business, as it led other payors to reduce their payments for valid and covered laboratory services, as well as seek lower paying contracts with Little River and cancel existing

and prospective business dealings that Little River was engaged in while BCBSTX was taking these improper actions.

94.     As a direct and proximate result of BCBSTX's wrongful conduct Little River has suffered damages, and will continue to suffer damages, in an amount to be fully demonstrated at a hearing in this proceeding.

## COUNT VII
### Exemplary Damages

95.     Trustee incorporates herein by reference all of the foregoing allegations as if set forth at length herein.

96.     Exemplary damages against BCBSTX are appropriate in this case because BCBSTX acted with bad faith and/or malice in (1) publically engaging in business disparagement of Little River; (2) interfering with existing contracts, and (3) interfering with prospective contracts.

97.     For all of the reasons set forth above, Trustee requests an award of exemplary damages in excess of its economic damages.

## COUNT VIII
### Declaratory Judgment

98.     Trustee incorporates herein by reference all of the foregoing allegations as if set forth at length herein.

99.     Trustee asks the Court to declare that BCBSTX engaged is business disparagement of Little River by deliberately publishing false disparaging claims regarding Little River's billing practices to numerous individuals, that this was done with malice, fraudulent intent, and bad faith, and that BCBSTX lacked privilege to make these false statements.

100.     Trustee asks the Court to declare that BCBSTX engaged in a civil conspiracy with others by initiating meritless Investigations to exert business pressure on Little River, and that

underlying actions of the conspiracy constitute business disparagement, among other claims under applicable law.

101.    Trustee asks the Court to declare that BCBSTX engaged in an abuse of process by making a bad-faith Case Notification to the OIG for the purpose of exerting business pressure on Little River.

102.    Trustee asks the Court to declare that BCBSTX interfered with existing contracts by making false disparaging claims against Little River to those entities which Little River had existing contracts, as well as inappropriately making changes in payment behavior and making such changes known to those entities, and providing guidance in how to make the same business relationship changes with Little River.  This directly resulted in those entities changing payment practices under those existing contracts and/or seeking new contracts with lower reimbursement rates.

103.    Trustee asks the Court to declare that BCBSTX interfered with prospective contracts by making false disparaging claims against Little River to those entities which Little River had existing contracts, as well as inappropriately making changes in payment behavior and making such changes known to those entities, and providing guidance in how to make the same business relationship changes with Little River.  This directly resulted in those entities changing its prospective business plans and/or abandoning joint expansion projects with Little River due to these allegations and lower payment rates.

104.    Trustee asks the Court to declare that BCBSTX engaged in unfair competition by making statements and taking other actions that interfered with Little River's ability to conduct its business, as BCBSTX's actions led other payors to reduce their payments for valid and covered

services, as well as seeking lower paying contracts with Little River and cancel joint business plans that Little River was engaged in while BCBSTX was taking these actions.

105.     As a direct result of BCBSTX'S actions, omissions, and breaches, Little River has suffered actual and significant consequential damages to be determined at a hearing in this matter.

## VII.     DISCOVERY RULE

106.     To the extent applicable, the Discovery Rule applies to delay the accrual of Little River's causes of action in this matter, as the nature of Little River's injuries and BCBSTX's conduct was inherently undiscoverable. Little River discovered the basis for these claims as described in this Complaint. Little River exercised due diligence prior to the assertion of these claims and only upon uncovering BCBSTX's conduct was Little River able to assert these claims, within the applicable statute of limitations.

## VIII.     JURY DEMAND

107.     The Trustee hereby demands a trial by jury on all triable issues.

## IX.     REQUEST FOR RELIEF

**WHEREFORE**, Trustee requests the following relief:

A.     BCBSTX's Proof of Claim No. 422 is disallowed in its entirety, or in the alternative, is equitably subordinated pursuant to 11 U.S.C. §§ 510(c).

B.     Judgment in favor of Trustee and against BCBSTX on Counts I through VIII in an amount to be determined in this proceeding, plus all applicable penalties, exemplary damages, pre and post-judgment interest, and attorneys' fees and costs under applicable law, and declarations in its favor as set forth and requested in Count VIII.

C.     Such other and further relief as the Court may deem just and proper.

Dated: September 14, 2020

Respectfully submitted,

*/s/ Brad Thompson*
Brad Thompson
State Bar No. 24046968
BThompson@duanemorris.com
Jacob P. Arechiga
State Bar No. 24069309
JArechiga@duanemorris.com
James Earl
State Bar No. 24099133
JVEarl@duanemorris.com
**DUANE MORRIS LLP**
Las Cimas IV
900 S. Capital of Texas Hwy, Suite 300
Austin, TX 78746-5435
Tel.: (512) 277-2247  Fax: (512) 277-2301

**ATTORNEYS FOR PLAINTIFF &
SPECIAL COUNSEL TO JAMES
STUDENSKY, CHAPTER 7 TRUSTEE**

By:*/s/ Brian T. Cumings*
Brian T. Cumings
State Bar No. 24082882
GRAVES, DOUGHERTY, HEARON &
MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, TX 78701
Telephone: 512.480.5626
Facsimile: 512.536.9926
bcumings@gdhm.com

**COUNSEL FOR JAMES STUDENSKY,
CHAPTER 7 TRUSTEE**

## **EXHIBIT C**

DISTRICT COURT CASE COMPLAINT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **JEFFREY MADISON, RYAN DOWNTON,** **PEGGY BORGFELD, KEVIN OWENS et al.,** | § § § | |
| **Plaintiffs,** | § § | |
| *v.* | § § | **Case No. 20-835** |
| **HEALTH CARE SERVICES** **CORPORATION, d/b/a BLUE CROSS AND** **BLUE SHIELD OF TEXAS,** | § § § § | **JURY DEMAND** |
| **Defendant.** | § § | |

**PLAINTIFFS JEFFREY MADISON, RYAN DOWNTON,**
**PEGGY BORGFELD, KEVIN OWENS, JEFF AND ASHLEY MADISON TRUST,**
<u>**AND KEVIN J. OWENS MANAGEMENT TRUST'S ORIGINAL COMPLAINT**</u>

Plaintiffs Jeffrey Madison, Ryan Downton, Peggy Borgfeld, Kevin Owens, Jeff and Ashley Madison Trust, and Kevin J. Owens Management Trust complain of Defendant Health Care Services Corporation d/b/a Blue Cross & Blue Shield of Texas ("***BCBSTX***"), and in support thereof would show:

**I.**
**PARTIES**

1.     Plaintiff Jeffrey Madison is a Texas resident residing at 201 Dovetail Cove, Georgetown, Texas 78628.

2.     Plaintiff Ryan Downton is a Puerto Rico resident residing at 6300 Isla Verde Ave, Apt. 907, Carolina, Puerto Rico 00979.

3.     Plaintiff Peggy Borgfeld is a Texas resident residing at 2378 County Road 320, Lexington, Texas 78547.

4.     Plaintiff Kevin Owens is a Texas resident residing at 5525 FM 2340, Burnet, Texas 78611.

5.      Plaintiff Jeff and Ashley Madison Trust is a Texas Trust, with an office at 201 Dove Tail Cove, Georgetown, Texas 78628.

6.      Plaintiff Kevin J. Owens Management Trust is a Texas Trust, with an office at 5525 FM 2340, Burnet, Texas 78611.

7.      Defendant BCBSTX is an Illinois Mutual Legal Reserve Company with its principal place of business at 300 E. Randolph St., Chicago, Illinois 60601. BCBSTX provides health insurance to businesses and individual insureds in the State of Texas.

## II.  JURISDICTION AND VENUE

8.      The damages sought by Plaintiffs are within the jurisdictional limits of this Court. The Court has jurisdiction due to the diversity of the parties and the amount in controversy pursuant to 28 U.S.C. § 1332.

9.      This is also a complaint under the Lanham Act, 15 U.S.C. §§ 1114, et seq., and certain related state law claims.  This Court has original subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367.

10.      Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claim occurred in the Western District of Texas, Defendant continuously and purposefully does business in this District, and five of the plaintiffs reside in this District.

## III.  FACTS

### A.      Plaintiffs Develop a Profitable Rural Healthcare System

11.      America today, and especially Texas, is facing a crisis in rural healthcare.  In the 1960s, Texas had 300 rural hospitals, but only 158 remain open today.  Texas also leads the nation in rural hospital closures, with 22 in the last decade alone.  The average Texas hospital closure

results in 170 lost jobs and $22 million in lost annual payroll.[1]

12.     Rural hospitals face a myriad of challenges including declining patient populations, disparate rates of uninsured patients, and below-cost reimbursement for services provided to Medicare and Medicaid patients.  In short, rural hospitals are only able to survive because private insurers have an obligation to pay rural hospitals 100% of their billed charges – or negotiate a contract giving the insurance company (and its insured beneficiaries) a reasonable discount.

13.     In the early 2000s, Madison was the CEO of a small rural hospital in Rockdale, Texas.  He negotiated with Rockdale Blackhawk, LLC to take ownership of operation of the Rockdale Hospital, where he continued to serve as CEO.  Owens invested in Rockdale Blackhawk, LLC and subsequently, worked with Downton to acquire ownership of Rockdale Blackhawk, LLC. In 2010, Owens changed the name of Rockdale Blackhawk, LLC to Little River Healthcare ("***Little River***").  Plaintiffs are now the ultimate owners of Little River.

14.     Beginning in 2013, Plaintiffs recognized that Little River needed to expand beyond its main campus in Rockdale, Texas to survive.  Little River began employing physicians up and down the I-35 corridor and expanded hospital outpatient services including, but not limited to, diagnostic imaging, surgical, and laboratory services.[2]  As part of Little River's expanding laboratory services, Plaintiffs built an entire new wing on to the Little River hospital for expanded laboratory service capabilities.  Providing all of these services to patients outside of Milam County allowed Little River to both cover losses and expand on-campus services in Rockdale.  Little River was one of a very small number of rural hospitals able to offer its medically underserved population

---

[1] https://www.torchnet.org/advocacy--rural-hospital-closure.html.
[2] Publicly available article accessible at: https://www.captodayonline.com/value-hospital-lab-outreach-underrated/ (last accessed September 13, 2020) ("Moreover, successful hospital laboratory outreach can furnish more than half of a hospital's pre-tax earnings while accounting for less than 10 percent of its overall cost.  It's one of the best-kept secrets in health care."); https://revcycleintelligence.com/news/transforming-the-hospital-laboratory-into-a-profit-center ("Hospitals that have been able to effectively institute laboratory outreach programs have awoken the sleeping giant.").

cardiac diagnostic and interventional catheterizations, as well as total joint replacement orthopedic surgery in a rural community.  It was also in the process of expanding its spine surgery capabilities and procuring the needed high tech lab equipment and supporting lab operating software needed to operate a fully accredited highly complex laboratory.

15.     Plaintiffs successfully grew their business, with Little River's operating income exceeding $36 million in 2015.  Plaintiffs planned to continue expanding by building a surgery center in Georgetown, Texas in 2017 (the "*Georgetown Surgery Center*").  Plaintiffs, through an entity other than Little River, had already acquired the land and secured development commitments.  Plaintiffs were each going to individually invest in the Georgetown Surgery Center.  The annual profits from the Georgetown Surgery Center would have exceeded $8 million.

16.     In 2016, Plaintiffs also began pursuing a majority recapitalization of Little River, whereby Plaintiffs would sell a majority of their equity in Little River to a private equity group.  Plaintiffs met with four investment banks, each of which valued the equity of Little River in excess of $350 million.  Plaintiffs retained the Cain Brothers investment bank to assist in the anticipated transaction.  In January 2017, Madison and Downton traveled to the JP Morgan Healthcare Investment Conference in San Francisco, California and met with approximately ten private equity groups with capital sufficient to buy the majority of Plaintiff's equity interest in Little River.  Madison and Downton presented the Little River model to the private equity groups.  At least seven of the groups expressed interest in continuing in the bidding process for the purchase of Little River, with a plan to expand Little River's proprietary "physician practice lease" model nationwide.  Plaintiffs were also considering investments in other non-Texas rural hospitals, including one in Colorado.  None of those hospitals would have been subsidiaries of Little River.

17.     Unfortunately, in 2016, as part of its campaign against Texas rural hospitals,

BCBSTX wrongfully withheld payment of tens of millions of dollars it owed Little River for services provided to BCBSTX insureds. As detailed below, BCBSTX also initiated a wrongful smear campaign against Little River and its owners, including wrongful allegations of fraud. Due to BCBSTX's nonpayment and lies about Little River, Plaintiffs were forced to stop the sale process and abandon plans to build the Georgetown Surgery Center in 2017.

18.     In 2018, Little River filed for arbitration against BCBSTX for breach of contract, violation of the Texas Prompt Pay Laws, and other claims (the "***Arbitration***"). BCBSTX counterclaimed for breach of contract and fraud. Little River also filed for bankruptcy and subsequently closed all of its hospitals and other medical facilities. In 2020, retired Texas Supreme Court Justice Harriet O'Neill, acting as arbitrator, found BCBSTX liable for $108 million for breaching its contracts with Little River and violating the Texas Prompt Pay Laws (as set forth in the "***Final Award***").[3] Justice O'Neill also denied BCBSTX's counterclaims in their entirety.[4] Judge King in the Western District of Texas Bankruptcy Court entered final judgment against BCBTSX.[5] BCBSTX did not appeal the Final Award and agreed to the final judgment.[6] Accordingly, BCBSTX's breach of its contracts with Little River and the fact that Little River did not commit fraud have been conclusively established in this case as a matter of law.

**B.     BCBSTX's Campaign to Target Rural Hospitals and Exacerbate the Rural Healthcare Crisis in Texas.**

19.     As an insurance provider that competes for government business in Texas, BCBSTX prides itself on its ability to offer in-network care in all 254 Texas counties. In rural

---

[3] Ex. A, Final Award in Case No. 01-18-0001-136, *Rockdale Blackhawk, LLC d/b/a Little River Healthcare v. Blue Cross & Blue Shield of Texas*, before the American Arbitration Associated, Retired Texas Supreme Court Justice Harriett O'Neill presiding as arbitration (the "Final Award"), at ¶¶ 1-5.

[4] Final Award at ¶¶ 134-136 ("Little River complied with the contractual terms;" "Little River did not commit fraud or fraudulent inducement.").

[5] Ex. B, Final Judgment at p. 2.

[6] *Id.*

counties that have only one hospital, BCBSTX must contract with that rural hospital to maintain "network adequacy."

20.　　At first glance, it would appear that BCBSTX needs rural hospitals and, indeed, BCBSTX gives public lip service to the *idea* that it cares about rural healthcare.  On the other hand, BCBSTX can save money if rural hospitals close and the patients are diverted to more distant, urban hospitals, since BCBSTX generally pays higher rates to rural hospitals than their urban counterparts.  The requirement to offer local in-network hospital care in all 254 Texas counties does not apply in counties where there is no hospital.  On information and belief, every time a rural hospital faces the threat of closure due to a low contract offer from BCBSTX, BCBSTX performs an internal analysis showing how much money it can save by diverting all of those patients to other, more distant, hospitals.  BCBSTX will also save money if rural patients put off medically necessary healthcare due to the lack of a local provider and local services.

21.　　At least as early as 2016, BCBSTX began a campaign targeting rural hospitals in Texas, seeking to reduce their reimbursement rates, force them to eliminate lawful services, and, ultimately, drive them out of business while also increasing BCBSTX profits.  In driving rural hospitals out-of-business, BCBSTX has negatively impacted: (1) the availability of care for rural patients; (2) the quality of care for rural patients; (3) the investment market in Texas rural healthcare; and (3) the employment market for persons who work for rural hospitals.

22.　　BCBSTX was aware the public would suffer if its strategy succeeded, but it continued undeterred, targeting hospitals it could subdue without fear of public reprisal.  BCSBTX wrongfully directs its employees to use regulators and legislators as leverage against rural hospitals to force them to reduce services and accept lower reimbursement rates.

23.　　BCBSTX realized that one way to force a hospital to accept lower rates was to tell

other insurers, regulators, legislators, and doctors that the hospital was committing fraud. However, BCBSTX had a duty to refrain from lumping in compliant hospitals, like Little River, with the bad actors.  In bad faith and/or with malice, BCBSTX reported at least Little River and, on information and belief, other providers for fraud as part of its inappropriate pressure tactics seeking to avoid payment obligations.[7]  Most hospitals cave to BCBSTX's inappropriate pressure tactics and agree to stop providing lawful services (because BCBSTX does not want to pay for them) and to sign lower contracts—even contracts that reimburse less than a hospital's cost of treating patients.

24.     During the same time period at issue here, publications reported that numerous rural Texas facilities were struggling to survive BCBSTX's strong-arm contracting tactics:[8]



**Struggling Rural Hospitals Say They're Being Preyed Upon by Blue Cross Blue Shield**

Hospital administrators throughout Texas say the insurance company is using "strong-arm" tactics to push unfavorable contracts.

25.     BCBSTX particularly wanted to drive rural hospitals out of laboratory operations. As hospital operators around the country were recognizing they had "the potential to significantly decrease healthcare costs and boost revenue through laboratory outreach programs."[9]  However,

---

[7] *See, e.g., Knox County Hospital District v. Health Care Services Corporation d/b/a Blue Cross Blue Shield of Texas*, Northern District of Texas, Cause No. 7:19-cv-00095; *Experience Infusion Center, LLC v. Health Care Service Corporation*, Southern District of Texas, Cause No. 3:16-cv-00199.
[8] Publicly available article accessible at: https://www.texasobserver.org/struggling-rural-hospitals-say-theyre-being-preyed-upon-by-blue-cross-blue-shield/ (last accessed September 13, 2020), and attached hereto as Exhibit C.
[9] Publicly available article accessible at: https://revcycleintelligence.com/news/transforming-the-hospital-laboratory-

hospitals performing outreach lab services compete with BCBSTX's preferred laboratory provider, Quest Diagnostics ("*Quest*").   On information and belief, improperly using confidential information concerning hospitals' referral relationships, BCBSTX directed Quest to market to physicians who referred laboratory specimens to hospitals to encourage them to switch their referrals from the hospitals to Quest.

26.    BCBSTX also identified hospital employment of physicians and similar employment-type relationships as a business practice detrimental to BCBSTX's profitability.  As a result, BCBSTX knowingly took actions to interfere with potential contractual relationships between hospitals and physicians.  In addition, BCBSTX began competing with hospitals by employing physicians in Texas, with plans to open at least 10 primary care practices in 2020 under the mantra, "if you can't beat 'em, buy 'em."[10]  BCBSTX will almost certainly direct all of its employed physicians to refer all of their laboratory patients to Quest.  By forcing hospital closures, BCBSTX eliminates competitors in the physician employment market.

### C.    BCBSTX Targets Little River

27.    BCBSTX noticed Little River's tremendous growth between 2013 and 2015, investigated Little River's claims at that time, found no issues, and generally paid claims. However, by 2016, BCBSTX decided it was paying Little River too much money and took action to reduce its exposure to Little River.  A central facet of Little River's proprietary growth strategy involved contracting with physicians through a practice lease model.  As set forth above, BCSBTX opposed contractual relationships between hospitals and physicians and sought ways to stop or minimize them.  Recognizing that a significant portion of Little River's growth came from laboratory services, BCBSTX started a larger investigation into Little River's laboratory practices

into-a-profit-center (last accessed September 13, 2020).
[10] https://www.modernhealthcare.com/insurance/blue-cross-joins-doctors-practice-party.

in early 2016.  Effective June 7, 2016, in violation of Texas law, BCSBTX stopped paying Little River for certain laboratory services using an internal audit program called "prepayment review."

28.     BCBSTX's prepayment review audit violates Texas law requiring an insurance company to pay all claims prior to auditing them.[11]

29.     On June 8, 2016, Downton explained to BCBSTX why its laboratory services complied with both the law and the contracts.[12]  Rather than accepting (or challenging) Downton's explanation, BCBSTX sent a report to the U.S. Department of Health and Human Services Office of Inspector General ("OIG") accusing Little River of committing fraud—based not on any violation of the law, but based on BCBSTX's conveniently incorrect interpretation of one of its own policies.  It remains unclear why a potential violation of an internal company policy would trigger a report to the OIG.[13]

30.     Significantly, in its report to the OIG, BCBSTX made no mention of Downton's explanation of regulatory (and contractual) compliance, which its lead investigator had received by phone only a day earlier.[14]

31.     BCBSTX's decision to withhold Downton's explanation in BCBSTX's report to the OIG constitutes bad faith and/or malice.

32.     On July 20, 2016, BCBSTX met with Madison and Downton to discuss the laboratory dispute.  At that time, BCBSTX delivered notice of contract termination, without cause, and proposed a new contract with a reimbursement reduction exceeding 80%.  Internally, BCBSTX discussed Little River's laboratory activities not as illegal, fraudulent, or a contractual breach, but

---

[11] Ex. A, Final Award, at ¶ 115 ("BCBSTX further violated the [Texas Prompt Pay Laws] by failing to first pay 100% of the claims [prior to conducting the audit];" TEX. INS. CODE §§ 843.338, 843.346, 1301.103; 28 TAC §§ 21.2802, 21.2807.

[12] *Id.* at ¶65.

[13] Justice O'Neill concluded that Little River had not actually violated any BCBSTX policy. *Id.* at ¶¶ 63-72.

[14] *Id.* at ¶130 ("BCBSTX was less than forthright by failing to convey Little River's explanation of its billing practices and its belief that they were fully compliant with CMS regulations.").

as a "loophole" that could be "plugged" with new contracts.[15]  In addition to its illegal prepayment review, BCBSTX also improperly recouped approximately $9.1 million from Little River, exacerbating Little River's cash-flow problems caused by BCBSTX's unlawful prepayment review.[16]

33.     Ultimately, Little River reluctantly agreed to a new contract at a more than 50% reduction in reimbursement (the "***New Contracts***") based on the belief that the new contracts would help ensure BCBSTX stopped its wrongful denial of Little River's laboratory claims.  Instead, unbeknownst to Little River, BCBSTX actually expanded its "lock" on payment to Little River. BCBSTX admits that its intent in renegotiating the contracts was to "disincentivize" Little River from performing lab services.[17]  At the same time, BCSBTX knew that Little River's ability to survive under the New Contracts was contingent on maintaining (or increasing) the volume of services it provided.  If Little River had, in fact, stopped providing lab services, it would have begun losing money on every BCBSTX patient it treated.  Yet BCBSTX did not really care if Little River closed, because on information and belief, it had already modeled the "savings" it would obtain if Little River closed.  Essentially, BCBSTX engineered a situation where it could give lip service to its support for rural healthcare through an in-network contract with Little River, while actually forcing Little River to reduce services and, ultimately, close its hospitals.

34.     Plaintiffs determined that Little River's survival depended on maintaining its growth strategy, including the growth of laboratory services.[18]  Unfortunately for Plaintiffs, when

---

[15] *Id.* at ¶68.

[16] *Id.* at ¶95.

[17] *Id.* at ¶126.

[18] "As hospitals are buying other hospitals, that creates a better math for them to be in the lab business, the business is all about scale, and it's all about high fixed cost low variable cost."  Publicly available article accessible at: https://www.360dx.com/clinical-lab-management/hospitals-explore-new-models-labs-post-pama#.XyFma55KhhE (last accessed September 13, 2020); "The good thing about laboratory outreach is that as your test volumes grow, your unit per test decreases because you're able to generate economies based on higher volumes." https://revcycleintelligence.com/news/transforming-the-hospital-laboratory-into-a-profit-center.

the payment rates in the New Contracts failed to "disincentivize" Little River, BCBSTX decided to wrongfully deny payment for Little River's laboratory services despite the new contract it had signed with Little River, ultimately wrongfully withholding approximately $65.1 million between 2016 and 2017.[19]  Facially, BCSBTX based most of its denials on an incorrect assertion that Little River did not have laboratory equipment sufficient to perform the testing on its own campus.

35.     In June 2017, a Little River affiliate, Timberland Healthcare, LLC closed its Timberlands Hospital in Crockett, Texas due to nonpayment from BCBSTX.  Around the same time, Downton told BCBSTX that Little River's remaining hospitals were in danger of closure unless BCBSTX began paying Little River according to the Contracts.  On information and belief, BCBSTX issued an internal directive to deny all Little River laboratory claims with a notation that Little River did not process the tests on its Rockdale campus.  In response to more complaints from Little River, several BCBSTX employees investigated the claim denials and realized that medical records demonstrated that the tests had, in fact, been performed in Rockdale—meaning BCBSTX's denials were in error.  Yet, rather than correct the error and pay Little River's claims, BCBSTX doubled down and accused Little River of fraud.

36.     First, in response to a newspaper quoting Downton blaming the facility closure on BCBSTX's failure to pay more than $32 million in Little River claims, BCBSTX issued a statement implying wrongful actions by Plaintiffs and Little River, stating, "this is not done yet" and "[b]ecause this is an open investigation we cannot comment further."[20]  In fact, at this time, BCBSTX had already concluded that Little River was, in fact, providing the relevant lab services on its own campus.  Second, in July 2017, BCBSTX made a presentation to other third-party

---

[19] BCSBTX's breach of the contracts has already been conclusively determined and is not at issue in this proceeding. Ex. A, Final Award at ¶1.

[20] https://messenger-news.com/2017/06/28/2blue-cross-issues-statement-regarding-lrh-allegations/.

payors, including, but not limited to, Aetna, Cigna, Humana, and United, accusing Little River of fraud and directing the other insurers to target Little River and other rural hospitals for contractual rate reductions.[21]  Third, BCBSTX sent communications to the Centers for Medicare and Medicaid ("CMS") accusing Little River of fraud.[22]  Fourth, on information and belief, BCBSTX contacted members of the Texas Legislature and employees of the Texas Department of Insurance (collectively, "Texas Officials") and accused Little River of committing fraud.  On information and belief, prior to the time BCBSTX accused Little River of fraud, BCBSTX had actual and/or constructive knowledge that it was wrongfully denying Little River claims.  As a result, these assertions were made in bad faith and/or with malice.

37.     BCBSTX's accusations against Little River percolated through the Texas medical community.  On information and belief, BCBSTX was a source for multiple articles in the publication "Modern Healthcare" wrongfully accusing Little River of engaging in a "laboratory billing scheme."[23]  Other publications repeated the defamatory allegations from Modern Healthcare.[24]  In the face of BCBSTX's fraud accusations and Little River's financial instability due to BCBSTX's nonpayment of $65 million, employed physicians began leaving Little River, non-employed physicians stopped referring patients to Little River, and it became impossible for

---

[21] Final Award at ¶ 121.

[22] Final Award at ¶¶ 35,128.

[23]  https://www.modernhealthcare.com/article/20180623/NEWS/180629971/data-show-pattern-of-high-lab-charges-at-little-river-healthcare-hospitals.
https://www.modernhealthcare.com/article/20181206/NEWS/181209956/bankrupt-health-system-with-huge-lab-charges-closes-hospitals-clinics.
https://www.modernhealthcare.com/article/20181201/NEWS/181209998/provider-with-ties-to-lab-billing-scheme-may-close.

[24]https://www.texasobserver.org/how-can-you-do-this-to-people-after-rural-hospitals-close-in-milam-county-residents-scramble-to-find-care/ ("*Modern Healthcare,* a trade publication, has linked the Little River closures to the company's practice of overcharging insurers for lab tests to bolster its bottom line. Insurers, claiming that they were fleeced by the hospital group, are trying to recoup the money they overpaid, piling on debt to the company.); https://www.yourglenrosetx.com/news/20190729/losing-lifeline-what-happened-when-two-rural-hospitals-closed ("Shortly before it closed, Little River was accused of billing insurers for a high number of tests or expensive tests for out-of-state patients, according to the news outlet Modern Healthcare. Claiming Little River had violated terms of their contracts, insurers have refused to pay its lab claims or have tried to recoup money already paid.").

Plaintiffs to recruit new physicians to Little River. Little River was forced to reduce services and lay off employees to cut expenses in an attempt to restructure. The Georgetown Surgery Center was designed as a joint venture with physicians. Plaintiffs were forced to abandon the project due to BCBSTX's accusations of fraud, which interfered with Little River's physician relationships and potential financing. Likewise, due to BCBSTX's accusations of fraud, Little River was unable to obtain financing necessary to complete its restructuring. Little River ultimately filed for bankruptcy and eventually liquidation.

38. While Little River was closing hospitals, BCBSTX reported net income of over $1.3 billion in 2017 and $4 billion in 2018 with a surplus in the bank of $16.9 billion.[25] BCSBTX's 2016 CEO, Patricia Hall, got paid $18 million in 2016, with her replacement, Paula Steiner, getting $14 million in 2017[26]—all while BCBSTX raised rates on Texas consumers by 60%.[27] At least part of BCBSTX's net income was wrongfully obtained through its tortious actions against Little River and other rural Texas hospitals.

### D.   BCBSTX's Wrongful Actions Have Damaged Plaintiffs

39. Plaintiff Jeffrey Madison was the Chief Executive Officer of Little River. Plaintiff Jeff and Ashley Madison Trust ("*Madison Trust*") is the owner of 48.70% of the membership interest in Compass Pointe Holdings, LLC, the ultimate owner of 100% of the equity interest in Little River. Collectively, Jeffrey Madison and the Madison Trust are referred to as "*Madison*."

40. Plaintiff Ryan Downton ("*Downton*") was the Chief Legal Officer of Little River and President of the Little River Healthcare Holdings, LLC Board of Directors. Downton is also the owner of 29.66% of the membership interest in Compass Pointe Holdings, LLC, the ultimate

---

[25] https://www.beckershospitalreview.com/payer-issues/health-care-service-corp-nets-4b-in-2018.html; https://www.documentcloud.org/documents/5764214-Health-Care-Service-Corp-FY-2018 html.
[26] https://www.modernhealthcare.com/executive-compensation/health-care-service-corp-bosses-rake-green.
[27] https://patientsrising.org/health-care-service-blue-cross-bonuses/.

owner of 100% of the equity interest in Little River. Since 2008, Downton also operated the Law Offices of Ryan Downton, whereby he provided legal services to physicians and hospitals outside of his employment with Little River. Downton also previously owned and operated other healthcare entities.

41.     Plaintiff Peggy Borgfeld ("**Borgfeld**") was the Chief Financial Officer of Little River. Borgfeld is also the owner of 16.09% of the membership interest in Compass Pointe Holdings, LLC, the ultimate owner of 100% of the equity interest in Little River.

42.     Plaintiff Kevin Owens was the founder of Little River Healthcare. At various points in time, Kevin Owens also invested in or owned hospitals in Bastrop, Texas and Mangum, Oklahoma, invested in Blackhawk Healthcare, LLC (a rural hospital operator), and owned many medical imaging centers in Central Texas and the Houston region. Plaintiff Kevin J. Owens Management Trust ("**Owens Trust**") is the owner of a 5.39% membership interest in Compass Pointe Holdings, LLC, the ultimate owner of 100% of the equity interest in Little River. Collectively, Kevin Owens and the Owens Trust are referred to as "**Owens**."

43.     Plaintiffs have been injured by BCBSTX's actions in multiple ways. First, BCBSTX's false and malicious statements about Little River prevented Plaintiffs from selling their equity interest in 2017 at a valuation exceeding $350 million. Plaintiffs' equity is now worthless as Little River is in a Chapter 7 liquidation bankruptcy. Second, BCBSTX's false and malicious statements about Little River have damaged each individual Plaintiff's business reputation and impacted their ability to obtain work. Third, BCBSTX has damaged the Texas rural hospital market preventing Plaintiffs from being able to effectively compete through investment in other rural healthcare providers. Fourth, BCBSTX's actions prevented the completion of the Georgetown Surgery Center, preventing Plaintiffs from profiting off of their intended investment.

44.     BCBSTX's wrongful actions include at least the following: First, using Little River's confidential information, BCBSTX explicitly encouraged its preferred laboratory provider, Quest Diagnostics, to "recruit" physicians who referred patients to Little River to get them to switch their referrals to Quest.  On information and belief, at BCBSTX's request, Quest told physicians that Little River's laboratory services were illegal and/or in violation of Little River's contracts with BCBSTX and the physicians should not refer to Little River.

45.     Second, BCBSTX directed other insurance companies to target Little River, stop paying it for lab services, and renegotiate their contracts with Little River to reduce payment amounts.  There are a limited number of health insurance companies in Texas, with BCBSTX (23.69%), United (14.61%), Humana (11.59%), Aetna (6.4%), and Cigna (3.59%) controlling approximately 60% of the market.[28]  Here, BCBSTX made at least one presentation to all of the major insurers in Texas wrongfully accusing Little River of fraud and directing the other insurers to target Little River.  BCBSTX knew that Little River would be forced to close if other insurers implemented rate cuts on the heels of BCBSTX's nonpayment.

46.     Third, BCBSTX wrongfully accused Little River of committing fraud in communications to CMS after BCBSTX discovered it had been wrongfully denying Little River laboratory claims.  Rather than admit its error and pay Little River's past-due claims, BCBSTX doubled-down on its strategy to shutdown Little River's laboratory operations by any means necessary—in this case by sending an email to CMS accusing Little River of fraud.

47.     Fourth, on information and belief, BCBSTX disparaged Plaintiffs and Little River to members of the Texas Legislature and the Texas Department of Insurance, accusing each hospital of committing fraud.  BCBSTX's reports about Little River were unjustified and made in

---

[28] Texas Department of Insurance 2018 Top 40 List of Insurers, https://www.tdi.texas.gov/company/top40.html.

bad faith and/or with malice.

48.     Fifth, BCBSTX stopped paying Little River, and dozens of other laboratory service providers in Texas, by instituting a "Prepayment Review Audit" in violation of Texas law.

49.     BCBSTX's goal throughout its entire campaign against Little River was to force Plaintiffs and Little River out of the laboratory business, increasing market share for its preferred provider, Quest, increasing its opportunities to employ physicians, and, presumably, increasing BCBSTX's profit margin.

## V.  CONDITIONS PRECEDENT

50.     All conditions precedent to recovery have been performed or have occurred.

## VI.  CAUSES OF ACTION

### COUNT 1
### VIOLATION OF THE LANHAM ACT

51.     Plaintiffs incorporate the foregoing paragraphs by reference.

52.     The Lanham Act (15 U.S.C. § 1125(a)) applies when a party disparages the commercial activities of another party in connection with any goods or services.  Any person who believes that he or she has been damaged by such act has standing to bring a claim, not merely the main target of the disparaging statements.  Plaintiffs have suffered damages through loss of business opportunities and loss of the value of their equity in Little River.

53.     BCBSTX made false and misleading commercial statements about laboratory testing offered by Little River including, at a minimum, the following:

> (1) On information and belief, BCBSTX directed its agent, Quest Diagnostics, to recruit physicians away from Little River by means of false statements;

> (2) BCBSTX made at least one presentation to other insurance companies falsely accusing Little River of committing fraud, with knowledge that such statements were false;

> (3) BCSBTX shared the false presentation with at least one insurer in writing; and

(4) BCBSTX made false accusations regarding Little River committing fraud, with knowledge that such statements were false, to regulatory stakeholders.

54. BCBSTX is not entitled to any privilege or qualified privilege because its false statements were made in bad faith and/or with malice.

55. The false statements had the capacity to deceive a substantial segment of potential consumers. More specifically, Little River had three relevant markets for its services: physicians, insurance companies, and Medicare/CMS. Little River needed physicians to refer patients for services and contracts with insurance companies and Medicare to pay for those services. BCBSTX's actions show an organized campaign to both penetrate the physician market and disrupt Little River's relationships with other insurance companies and Medicare in a way that harmed Little River. First, BCBSTX acted in concert with Quest to expand Quest's share of the Texas laboratory market by, on information and belief, giving physicians false information about Little River. Second, BCBSTX gave a presentation to insurers telling them to target Little River based on false allegations that Little River was committing fraud and then emailed that presentation to at least one insurer. Third, BCBSTX emailed CMS accusing Little River of fraud. Each of these individual communications had the capacity to deceive a substantial segment of potential consumers.

56. BCSBTX's deception was material in that no insurer or physician, let alone Medicare, will do business with an individual or hospital that is committing fraud.

57. Little River provided laboratory testing both within and outside of Texas and owned a laboratory in Illinois that processed Texas samples. Accordingly, Little River's laboratory services were in interstate commerce.

58. Plaintiffs have been damaged as a result of BCBSTX's false statements. First, as the owners and officers of Little River Healthcare, Madison, Downton, Borgfeld, and Owens's

personal business reputation and future business opportunities were damaged by BCBBSTX's false statements about Little River. Madison, Downton, and Borgfeld provide services to hospitals and physicians. Madison was generally recognized as the face of Little River. Downton was publicly associated for the Little River brand and regularly served as its spokesperson in media interviews, including interviews about the dispute with BCBSTX. Further, prior to his relationship with Little River, Madison provided services to other rural hospitals and Downton represented physicians and other healthcare providers and also owned, operated, and eventually sold another healthcare business. Owens was widely known as the founder of Little River. In short, BCBSTX's false accusations of fraud damaged Plaintiffs' reputation for providing legal, managerial services, and investment services to physicians and hospitals, making it more difficult to obtain work and/or find investment opportunities, causing a reduction in income. For instance, one prominent hospital in Austin requires employees to sign a certification that they have no knowledge of Little River's laboratory billing as a condition of employment. Madison, Downton, and Borgfeld cannot sign such a certification. The stain on Plaintiffs' reputation will remain forever despite the recent Arbitration award against BCBSTX.

59. Second, BCBSTX's false statements prevented Plaintiffs from selling their equity interests in Little River based on a value in excess of $350 million in 2017.

60. Third, BCBSTX's false statements prevented completion of the Georgetown Surgery Center, which would have allowed each Plaintiff to individually profit separate from their investments in Little River.

61. Fourth, BCBSTX's false statements ultimately resulted in the closure of Little River's medical facilities and elimination of Plaintiffs' entire equity value. BCBSTX's false statements to physicians, insurance companies, and regulators damaged Little River's business

reputation and prospects, resulting in the diminution of the value of Plaintiffs' equity in Little River.[29]

62.      In addition to damages sustained by Plaintiffs, as described above, Plaintiffs seek disgorgement of BCBSTX's profits resulting from its false advertising pursuant to 15 U.S.C. § 1117(a).  By making false statements about Little River and other rural hospitals, BCBSTX forced such hospitals out of the laboratory business and/or forced such hospitals to close.  As a result of the hospitals' cessation of laboratory services and/or closure, BCBSTX wrongfully profited by paying less for lab services.  Healthcare Service Corporation, the legal entity of which BCBSTX is an unincorporated division, made more than $1.3 billion in net income in 2017 and more than $4 billion in net income in 2018.  As a matter of equity, and in compliance with 15 U.S.C. § 1117(a), BCBSTX should be required to disgorge the profits resulting from its wrongful actions in an amount to be determined by the Court.

63.      Most of BCBSTX's statements in violation of the Lanham Act were made within the last four years.  To the extent any preceded the filing of this Complaint by more than four years, the discovery rule applies because any such statements at issue were not known by Plaintiffs prior to filing of the Final Award and are not public knowledge.

## COUNT 2
## DEFAMATION

64.      Plaintiffs incorporate the foregoing paragraphs by reference.

65.      BCBSTX published false statements about Little River and, by implications, its owners and officers.  Specifically, BCBSTX published at least the following false statements:

---

[29] Plaintiffs do not seek recovery of the "Enterprise Value" of Little River, which is equal to Little River's equity value plus Little River's debt.  To the extent BCBSTX damaged Little River by causing increased levels of debt, consulting expenses, and/or bankruptcy expenses, such damage claims are the property of the Little River bankruptcy estate and are not at issue in this litigation, which is explicitly limited to loss of opportunity to sell individually owned equity and loss of individually owned equity value in membership interests, which are not part of the bankruptcy estate.

    (1) On information and belief, directives to its agent, Quest Diagnostics, to recruit physicians away from Little River by means of false statements;

    (2) Submitting a report to the OIG falsely accusing Little River of fraud without including Little River's explanation of the legality of its business;

    (3) At least one presentation to other insurance companies falsely accusing Little River of committing fraud, with knowledge that such statements were false;

    (4) Sharing the false presentation with at least one insurer in writing;

    (5) Emails to CMS falsely accusing Little River of committing fraud, with knowledge that such statements were false; and

    (6) On information and belief, falsely accusing Little River of committing fraud in statements to elected officials and regulators.

66.    BCBSTX is not entitled to any privilege or qualified privilege because its false statements were made in bad faith and/or with malice

67.    Under Texas law, statements falsely accusing a company of fraud are deemed statements about the company's owners.  In this case, anyone who knew any of the individual Plaintiffs would equate statements accusing Little River of fraud with statements accusing each individual Plaintiff of committing fraud.

68.    BCBSTX acted negligently with respect to all six false statements and with gross negligence and/or malice in making, at a minimum, false statements 3, 4, and 5 as set forth in ¶66.

69.    In addition to general damages for loss of reputation and mental anguish for all individual palintiffs, Madison, Downton, and Borgfeld also suffered special damages through job loss and difficulty finding new work.  Downton and Owens suffered special damages through the loss of investment opportunities.

70.    The discovery rule applies to defamation claims when the statements at issue are not public knowledge.  Plaintiffs were not aware of BCBSTX's defamatory statements and the statements were not public knowledge until Little River filed the Final Award from the Arbitration

in open court on May 6, 2020.

## COUNT 3
## BUSINESS DISPARAGEMENT

71.     Plaintiffs incorporate the foregoing paragraphs by reference.

72.     BCBSTX published false and disparaging statements about Little River and, by implications, its owners and officers.  Specifically, BCBSTX published at least the following false statements:

> (1) On information and belief, directives to its agent, Quest Diagnostics, to recruit physicians away from Little River by means of false statements;

> (2) Submitting a report to the OIG falsely accusing Little River of fraud without including Little River's explanation of the legality of its business;

> (3) At least one presentation to other insurance companies falsely accusing Little River of committing fraud, with knowledge that such statements were false;

> (4) Sharing the false presentation with at least one insurer in writing;

> (5) Emails to CMS falsely accusing Little River of committing fraud, with knowledge that such statements were false; and

> (6) On information and belief, falsely accusing Little River of committing fraud in statements to elected officials and regulators.

73.     BCBSTX is not entitled to any privilege or qualified privilege because its false statements were made in bad faith and/or with malice.

74.     While a claim for defamation provides redress to injury to a person's reputation, a claim for business disparagement provides redress to injury to a person's economic interests. Plaintiffs suffered special damages through economic losses.  First, beginning in the Spring of 2016 and continuing until early 2017, Plaintiffs endeavored to sell a controlling interest in Little River Healthcare.  At least four investment banks valued the equity value of Little River at an amount in excess of $350 million.  There was significant interest in Little River from a variety of private equity funds.  Unfortunately, Plaintiffs were forced to terminate the sale process in early

2017 due to BCBSTX's business disparagement.  In the absence of BCBSTX's business disparagement, it is likely Plaintiffs would have sold their equity in Little River based on an equity valuation in excess of $350 million.  Today, Little River is in bankruptcy and Plaintiffs' equity interest is worthless.

75.     Madison, Downton, and Borgfeld also suffered special damages through job loss and difficulty finding new work.  Additionally, as Madison, Downton, and Owens invested in rural healthcare businesses, they lost their opportunity to continue in that business due to BCBSTX's defamatory conduct.

76.     The discovery rule applies to business disparagement claims when the statements at issue are not public knowledge.  Plaintiff were not aware of BCBSTX's specific defamatory statements and the statements were not public knowledge until Little River filed the Final Award from the Arbitration in open court on May 6, 2020.

## COUNT 4
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS

77.     Plaintiffs incorporate the foregoing paragraphs by reference.

78.     Absent BCBSTX's tortious actions, it is likely the Georgetown Surgery Center would have been built with Plaintiffs as key investors.  The plans to build the Georgetown Surgery Center were aborted due to the malicious and intentional acts of BCBSTX, which were done with an intent to prevent Plaintiffs and Little River from expanding and building new relationships with physicians.  As a result of cancellation of the Georgetown Surgery Center project, Plaintiffs have been damaged.

## COUNT 5
## UNFAIR COMPETITION

79.     Plaintiffs incorporate the foregoing paragraphs by reference.

80.     BCSBTX's actions as set forth above constitute business conduct which is contrary

to honest practice in commercial matters and, therefore, unfair competition under Texas law.  In short, BCBSTX's illegal acts interfered with Plaintiffs' ability to conduct their business.  By virtue of BCBSTX's unfair competition, Plaintiffs were deprived of their ability to sell a majority equity interest in Little River for a valuation exceeding $350 million.

81.     The discovery rule applies to unfair competition claims when the statements at issue are not public knowledge.  Plaintiffs were not aware of BCBSTX's specific defamatory statements and the statements were not public knowledge until Little River filed the Final Award from the Arbitration in open court on May 6, 2020.

## COUNT 6
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

82.     Plaintiffs incorporate the foregoing paragraphs by reference.

83.     BCBSTX's intentional and/or reckless actions, as set forth above, were extreme and outrageous and caused each individual plaintiff severe emotional distress, with negative impacts on each plaintiff and their families.  For instance, various plaintiffs contemplated suicide, lost sleep, experienced marital discord, and/or moved out of Texas as a result of BCBSTX's actions.

## COUNT 7
## EXEMPLARY DAMAGES

84.     Plaintiffs incorporate the foregoing paragraphs by reference.

85.     Exemplary damages may be awarded when the harm to a plaintiff results from: (1) fraud; (2) malice; or (3) gross negligence.  BCBSTX's defamation, business disparagement, and violations of the Lanham Act all resulted from malice and/or gross negligence.  Accordingly, Plaintiffs seek an award of exemplary damages.

## VII.  ATTORNEYS' FEES

86.     Plaintiffs also seek recovery of their reasonable attorneys' fees in this matter.

## VIII.  JURY DEMAND

87.    Plaintiffs demand a trial by jury.

## IX. PRAYER

88.    Plaintiffs pray and demand that judgment be entered in their favor and against

Defendants as follows:

(a)    damages in an amount to be determined;

(b)    treble damages pursuant to 15 U.S.C. § 1117(a);

(c)    exemplary damages;

(d)    prejudgment and post-judgment interest as allowed by law;

(e)    attorneys' fees and costs of court; and

(f)    such other and further relief deemed appropriate by the Court.

Respectfully submitted,


/s/ Ryan Downton
Ryan Downton
RYAN DOWNTON, P.C.
Texas Bar No. 24036500
6300 Isla Verde Ave., Ste. 907
Carolina, PR 00979
Phone: 512-680-7947
Rdownton1@gmail.com

***Attorneys for Plaintiffs***